493 So.2d 1236 (1986)
Thomas William COON, et al., Plaintiffs-Appellees-Appellants,
v.
PLACID OIL COMPANY, et al., Defendants-Appellants-Appellees.
No. 85-296.
Court of Appeal of Louisiana, Third Circuit.
August 29, 1986.
Rehearing Denied September 24, 1986.
*1238 Gold, Simon, Weems, Bruser, Sharp, Sues & Rundell, Henry B. Bruser, III, Alexandria, for plaintiffs-appellees-appellants.
W. Timothy Allen, III and J. David Garrett, of Blanchard, Walker, O'Quin & Roberts, Shreveport, for defendants-appellants-appellees.
Speedy O. Long, Trout, for plaintiffs-appellees.
Gaharan and Wilson, Joseph Wilson, Jena, for defendants-appellees.
Before KNOLL, KING and BRUNSON[*], JJ.
KNOLL, Judge.
Thomas W. Coon (hereafter Coon), Charles Kelly and Katherine Kelly (hereafter the Kellys) sued Placid Oil Company (hereafter Placid) and Justiss Oil Company (hereafter Justiss) seeking damages for the loss of future oil production from the Kelly # 2 Well, surface damages, mental anguish and inconvenience caused by the May 22, 1981, blowout of Placid's neighboring RGR # 4 Well. The trial court awarded damages against Placid and in favor of Coon for loss of future income in the amount of $724,402, and in favor of the Kellys for loss of future income, surface damages, mental anguish and inconvenience in the amount of $145,775; the claims of Coon and the Kellys against Justiss were dismissed. Placid was also assessed with costs to include plaintiffs' expert witnesses in the sum of $24,000.55.
Coon and the Kellys appeal the trial court's dismissal of their claims against Justiss. Placid appeals contending that the trial court erred: (1) in awarding Coon and the Kellys speculative damages for the loss of future oil production from the Kelly # 2 Well; (2) in finding the blowout of its RGR # 4 Well was the proximate cause of damages to the Kelly # 2 Well; (3) in its factual findings that the Kelly # 2 Well could not be reworked, and that a replacement well could not have been drilled on the Kelly property after the blowout of the RGR # 4 Well; (4) in awarding the Kellys surface damages, and damages for their mental anguish and inconvenience or, in the alternative, that the award was excessive; and (5) in awarding Coon and the Kellys expert witness fees totalling $24,000.55.

FACTS
The Kelly # 2 Well was drilled in the Rogers Field which is located in southern LaSalle Parish. The subterranean oil sands in the Rogers Field are referred to as the: (1) K-2 Cockfield Sand (approximately 1400 feet deep); (2) K-3 Cockfield Sand (between 1488 and 1500 feet); and (3) Sparta S-2 Sand (between 1800 and 1850 feet).
Completion in the Sparta S-2 zone of the Rogers Field was first accomplished in 1958 when Nebo Oil Company drilled the Nebo-Fee # 91 in the center of the NE/4 of the NW/4 of Section 8, T6N, R3E. At the time of trial, # 91 was still in commercial production and had produced 150,000 barrels of oil. In 1958 Nebo also drilled the John Howard-Whatley # 1 Well; this is the Kelly # 1 Well Coon attempted unsuccessfully to rework on the Kelly property before drilling Kelly # 2. The John Howard-Whatley Well was originally completed in the Sparta S-2 Sand approximately 800 feet west of # 91, and although it produced 35 barrels of oil in a test of the S-2 Sands, it never achieved sustained commercial production. Even though moving up hole in the John Howard-Whatley Well to the Cockfield K-2 zone produced 5 to 8 barrels of oil, no commercial production resulted.
After abandoning the John Howard-Whatley Well, Nebo paid in-lieu royalty payments to the lessors pursuant to the lease in an amount equivalent to 1/8 the production of # 91; these in-lieu payments continued until the latter part of 1964.
In 1967 Bodcaw, the successor to Nebo and the predecessor to Placid, drilled Bodcaw Fee # 126 and # 127 in the Sparta zone *1239 to offset production of Cenla Oil Inc.'s two wells, Cenla-Norris # 1 and Cenla-Norris # 2, in the SE/4 of the NW/4 of Section 8.
Between 1967 and the completion of the Kelly # 2 Well in 1981 no wells were completed by Placid in the Rogers Field Sparta zone.
In May 1980 the Kellys granted Coon an oil, gas and mineral lease on the 16 acres they own in the Northwest Quarter of the Northwest Quarter of Section 8, T6N-R3E, LaSalle Parish, Louisiana.
Coon first attempted to re-work the John Howard Whatley # 1 Well, renamed the Kelly # 1 Well, which the Nebo Oil Company originally drilled and abandoned in 1958. After failing to reach his zone of interest because of scrap metal and concrete encountered at the 1400 foot level of the Kelly # 1 Well, Coon drilled a new well, the Kelly # 2, 200 feet south and 100 feet west of the northeast corner of the Kellys' property. In November 1980 Coon completed the Kelly # 2 Well in the Sparta S-2 Sand at the level of 1838 to 1842 feet. Coon produced 3,080 barrels of oil from November 1980 through early May 1981 while experiencing mechanical problems caused by sand produced with the oil. The sanding problem became economically unfeasible at the S-2 zone, so on May 5, 1981, Coon set a cast iron bridge plug, came up the well hole and perforated the Cockfield K-3 Sand at the level of 1,488.5 to 1,490.5 feet. Almost immediately the well produced gas from the K-3 zone which was flared to the atmosphere from May 6, 1981, to May 14, 1981. On May 20, 1981, Coon reopened the well to flare gas.
When the Kelly # 2 Well was potentialed at 100 barrels a day, shortly after perforating in the Sparta S-2 zone, Placid commenced drilling RGR # 3 900 feet east of Kelly # 2 to prevent possible drainage by Kelly # 2 from the oil reservoir.
On May 20, 1981, Justiss began drilling on a day work contract Placid's RGR # 4 Well, another offset well, approximately 450 feet southeast of the Kelly # 2 Well. On May 22, 1981, after drilling to a depth of 1,832 feet, the RGR # 4 Well blew out of control and forced Coon to shut in the Kelly # 2 Well which had been flaring gas. The effects of the blowout caused extensive surface cracking and cratering between the RGR # 4 Well and the Kelly # 2 Well. Gas, water, sand and mud were pushed to the surface and several geysers erupted on the Kelly property. On a line that ran northwest to southeast between the two wells, cracks opened up spewing fluids and gas. Numerous large craters opened in the area, as well as one which occurred near a stream bed that flowed through the Kelly property; the stream bed sanded in one mile in either direction of the crater. Although there were surface cracks 50 to 70 feet from the Kelly # 2 Well, there were no craters immediately adjacent to that well. By May 29, 1981, Placid killed the blowout, and plugged and abandoned its RGR # 4 Well. Placid filled the various holes on the Kelly property, spending in excess of $20,000 on the work. After the blowout of RGR # 4 Coon neither reentered the Kelly # 2 Well nor was any other well drilled by him on the property he leased from the Kellys.

DAMAGES
The jurisprudence has generally denied damages resulting from oil well blowouts because such damage awards are too speculative. In the present case, the trial court concluded that Coon and the Kellys proved damages to the underground strata of this well to a legal certainty sufficient to base a damage award. On appeal Placid attacks the trial court's judgment contending that, although technology and scientific method have improved the ability to ascertain damages to subterranean oil sands, those advancements still do not assist Coon and the Kellys because the well at issue had not attained commercial production at the time of the blowout, and, because of the nature of the oil bearing sands at the well hole, commercial production could not have been achieved in the Kelly # 2 Well even if the blowout of RGR # 4 had not occurred.
*1240 Where through the fault of another, property has been damaged and legal recourse is sought, the judicial process essentially strives to restore the claimant, as nearly as possible, to his state immediately prior to the damaging occurrence. Petrol Industries v. Gearhart-Owen Industries, 424 So.2d 1059 (La.App. 2nd Cir.1982). When damages are claimed their amount must be proven with certainty. Clement v. Louisiana Irrigation & Mill Co., 129 La. 825, 56 So. 902 (1911); Smith v. White, 411 So.2d 731 (La.App. 3rd Cir.1982), writ denied, 413 So.2d 508 (La.1982). Proof which establishes only possibility, speculation or unsupported probability does not establish a damage claim. Mitchell Bros. v. Dinvaut, 374 So.2d 199, (La.App. 4th Cir.1979), writ denied, 376 So.2d 1271 (La.1979); Rawley v. Rawley, 357 So.2d 286 (La.App. 1st Cir.1978), writ denied, 357 So.2d 1154 (La.1978), cert. den., 439 U.S. 968, 99 S.Ct. 459, 58 L.Ed.2d 427 (1978). Courts cannot award speculative damages. Coco v. Richland General Contractors, Inc., 411 So.2d 1260 (La.App. 3rd Cir.1982), writ denied, 413 So.2d 909 (La.1982); McCoy v. Arkansas Natural Gas Co., 175 La. 487, 143 So. 383 (1932).
Where the thing damaged can be adequately repaired, the cost of restoration should equal the measure of damages. If the damaged property cannot be adequately repaired, the judicial objective of restoring the claimant to his position immediately prior to damage may be achieved by awarding him the difference in the value of the property before the damage occurred and just afterwards. Petrol Industries, supra; Schexneider v. United Geophysical Corp., 385 So.2d 533 (La.App. 3rd Cir.1980).
Placid contends that the Kelly # 2 Well was no less valuable after the blowout than it was prior. It reasons that prior to the blowout the Kelly well was not commercially productive, and there was not sufficient evidence that it would have achieved commercial production from any of the three oil bearing sands at the well bore if the blowout had not occurred.
Manchester Drilling Company drilled the Kelly # 2 Well to a total depth of 1905 feet, and Schlumberger took electric logs at various well depths. O'Malley Laboratories analyzed the various core samples taken. These electric logs and core samples were used by the various experts as references for their estimates of the well's potential.
Shortly after completing the Kelly # 2 Well in the Sparta S-2 zone, Coon employed Earl Peavy, a consulting petroleum engineer, to evaluate the economic potential of his well. Prior to the blowout Peavy estimated that the Kelly # 2 Well could recover 68,839 barrels of oil from all three zones.
Coon perforated the well in the Sparta S-2 Sands, the deepest of his commercial zones of interest, at a depth of 1838 to 1842 feet. From November 1980 through May 1981 the Kelly # 2 Well produced 3,080 barrels of oil from this sand. Although Coon's preliminary tests showed that the well had potential to produce 100 barrels of oil per day, Coon experienced mechanical problems caused by the production of sand with the oil. Despite corrective measures and the expenditure of $45,753 for workover costs, this sanding problem continued. By May 1981 Coon was faced with making a substantial investment in more sophisticated control methods in hope of combating the sand. Unable to commit his finances to such a venture, Coon chose to set a cast iron bridge plug at the Sparta S-2 zone, and recomplete the well in the Cockfield K-3 zone between 1488.5 and 1490.5 feet. Within 30 minutes after recompletion in the K-3 zone the well began to flow gas on its own. This gas was flared to the atmosphere from May 6 through May 14, and on May 20 Coon reopened the well to continue the flaring of gas. No oil was produced from the K-3 zone prior to the blowout of Placid's RGR # 4 Well.
The third zone of interest for Coon, the Cockfield K-2 zone located at approximately 1400 feet, was never completed prior to the blowout of the RGR # 4 Well.
To establish their well damages to the Cockfield K-2 and K-3 Sands, as well as *1241 the Sparta S-2 Sand, Coon and the Kellys relied on estimations of reservoir potentials prepared by their expert consulting petroleum engineers, Peavy and Paul Montgomery. The trial court's final damage award coincided with the reservoir estimations projected by Peavy in his rebuttal testimony.
The expert petroleum engineers referred to various components of a formula used to estimate recoverable oil reserves. Porosity is the relative volume of the pore spaces between the mineral grains in comparison to the total rock volume. For example, a porosity of 40% indicates that pore spaces constitute 40% of the sand volume. There is an assumption that pore space is filled either with connate water or hydrocarbons. By evaluating the electrical resistivity logs the percentage of pore space saturated with water can be determined; a water saturation of 40% indicates that 40% of the pore spaces is water filled and 60% is filled with hydrocarbons. The formation volume factor is an adjustment figure used to compensate for either the compaction or expansion of fluid in the underground reservoir when it is drawn to the surface. A formation factor of 1 is indicative that for every unit-volume of hydrocarbon in the reservoir that same fluid will be equal in unit-volume when it is measured at the well surface. Finally the petroleum engineer prepares a map of the underground reservoir based on the factors stated above, any relevant production history of the oil field and the thickness of the oil bearing sand, to determine the area of the reservoir that the oil well is estimated to drain, there being an assumption that an oil well is not capable of extracting by primary means of production 100% of the oil in place in any given reservoir.
Placid does not dispute the methodology utilized by Peavy and Montgomery, but strenuously urges that these experts failed to consider relevant data and assumed predictions with no basis. Accordingly, they contend the damage award is too speculative to support the trial court's judgment.
Prior to the blowout Peavy estimated 32,823 barrels of oil recoverable from the Sparta S-2 reserves from Kelly # 2. His estimate was based on 4 feet of oil bearing sand, 15 acres drainage, 31% porosity, 35% connate water saturation, an assumed formation volume factor of 1 and a 35% reservoir recovery efficiency. His estimates of the K-3 zone totaled 15,904 barrels of oil producible over 26 months, using 4 feet of net oil pay, 35% porosity, 39% water saturation, a formation volume factor of 1, and an 8 acre drainage area. As regards the Cockfield K-2 Sand he estimated 20,112 barrels of oil, relying on an 8 acre drainage area, and a 40% water saturation.
On rebuttal, Peavy increased his estimation of recoverable Sparta S-2 oil to 39,500 barrels, and reduced the oil recoverable from the Cockfield K-2 and K-3 Sands to 5500 and 5400 barrels, respectively. Peavy attributed his change of estimates on rebuttal to evidence he heard during Placid's presentation of its case. This change in testimony was based primarily on Placid's files on its wells in the area which had not been available to him prior to trial because of Placid's policy of not making this data available to competitors.
Montgomery, plaintiffs' other expert petroleum engineer, estimated the Kelly # 2 reserves in the Sparta S-2 Sands at 32,828 barrels based on 4 feet of net oil sand, a 15 acre drainage area, 31% porosity, and 35% water saturation. In the Cockfield K-3 Sands he estimated 19,550 barrels of oil recoverable, based on 40% water saturation, 4 feet of net oil sand, 35% porosity, 30% recovery ratio, and a 10 acre drainage area. He also concluded that in the Cockfield K-2 Sands Coon could have recovered 25,136 barrels of oil. In reaching this conclusion he used factors of 6 feet net oil sand, 30% porosity, 40% water saturation, a formation factor of 1, 30% recovery, and a drainage area of 10 acres.
The Sparta S-2 Sand was Coon's zone of primary interest and, because he actually produced oil from there, it presents the strongest claim of damages. However, the initial hurdle plaintiffs' experts had to overcome *1242 in the proof of damages to the Sparta S-2 zone was the establishment that production in this zone could have been economically restored. Coon abandoned his S-2 production prior to the blowout because of sanding problems. Therefore, since it is unquestioned that the blowout did not precipitate Coon's abandonment of the S-2 zone, it was incumbent on him to establish by a preponderance of the evidence that "but for" the blowout he would have been able to reinstitute production from this zone.
Coon stated that oil flowed within 24 hours after perforating the Sparta S-2 zone. With this oil production, however, sand was carried by the oil, got into the surface well equipment and sanded-up the well hole. His two attempts to use sand screens to filter the oil proved fruitless; one screen let the sand through and the other let in neither the oil nor the sand. Because of this problem, his well was not able to function on a regular basis and required workover operations almost weekly. Coon thought by leaving the zone temporarily, the sand would settle and would be less troublesome when he later reentered the zone. Coon as well as his experts concluded, nonetheless, that Coon had not exhausted the possible remedies concerning his sanding problem; they opined that gravel packing as well as plastic sand consolidation were available. Montgomery stated, "[Coon] had not exhausted the possibilities " and that it was "possible that by spending more money he could come up with a system which would allow him to produce the S-2 Sand reservoir." (Emphasis added.)
Placid's experts, particularly Dale Branstetter, were unanimous in their opinion that after producing vast volumes of sand from a reservoir that the odds of returning it to production are minimal. Montgomery, plaintiffs' own expert, stated that once you move a very large volume of sand, it becomes more difficult to stabilize the reservoir and eliminate the probability of continued sand production.
With regard to sand control techniques, W.L. Davis, Placid's district superintendent in LaSalle Parish, testified that between 1962 and 1967 Bodcaw, Placid's immediate mineral predecessor, treated 36 wells utilizing four separate sand control techniques. Their success ratio was 20%-25%, and after 1967 Bodcaw did not attempt further sand control treatment. Davis further stated that to have had any success at sand control it would have been necessary to incorporate a control method before the production began.
Coon further professed an opinion, unsupported even by his own experts, that by temporarily abandoning the S-2 zone the sand would settle, and would be less of a problem when he reentered. Coon could not cite for the trial court an example in any oil field which bore out this hypothesis.
Robert Meredith, Coon's expert witness, addressed the availability of sophisticated sand control methods, their great expense (between $2500 and $25,000), and his use of these methods with some success in offshore wells. Montgomery characterized the use of such devices as possibly producing positive results. And Peavy at best concluded that the presence of sand problems does not mean a well has no capability to extract oil, but that the use of more expensive methods of sand control must be evaluated in terms of whether the expected production warranted the additional expense. We find the conclusions of Meredith, Montgomery and Peavy concerning Coon's chances of commercially producing oil from the S-2 zone purely speculative, therefore, the trial court clearly erred in basing a damage award on no more than speculation.
The trial court's award of damages for the Cockfield K-2 and K-3 zones is similarly flawed. Unlike the Sparta S-2 Sand which had produced oil, plaintiffs' burden of proving damages to the K-2 and K-3 zones was more onerous because no oil had yet been produced from either region. At the time of Kelly # 2's perforation into the Cockfield K-3 Sand, no well had ever produced oil on a commercial basis from *1243 that sand in the Rogers Field. The same was also true for the K-2 Sand.
At the time of the blowout the Kelly # 2 Well was perforated into the K-3 Sand, was flaring gas, and had produced no oil. Montgomery, Peavy and Meredith opined that although the well flared gas for ten days, within a short period of time Coon's well would have produced oil from the K-3 zone. They referred to the core samples and electric logs and said that the gas Coon was flaring from the K-3 Sand was solution gas or a gas cap on top of an oil accumulation. Meredith said, "[Given] time it [the K-2 Sand] would have started making oil ... I don't think it would have gone on but a few more days, a week or two and then it's got to start making oil sooner or later."
Placid, though arguing otherwise, carries plaintiffs' argument one step further. W.L. Davis, a Placid petroleum engineer with Cockfield experience in the Rogers Field since before 1963, described this sand, most optimistically, as three feet of oil bearing sand on top of eight feet of water. However, he further concluded that because the oil was highly viscous and in close proximity to water, water would flow through the unconsolidated sands of the K-3 zone to the well bore quicker than oil and would almost immediately produce a water coning problem in the well bore. As example of the lack of production in this zone Davis referred to two unsuccessful Cockfield wells. In 1963 Bodcaw drilled the 35 LLS north of the Rogers Field to determine an economic production rate and to test sand consolidation techniques. The 35 LLS had 11 feet of sand on top of water, and had a log calculated water saturation of 36%. Even though the zone of interest was treated with a Halliburton Sand Fix Process and the well was produced at a restrictive rate, the well was shut down because of sand production and drastically increased water production. The other well, the Bodcaw Fee LLS # 67, was drilled in the K-3 Sand in the Rogers Field just east of the Fee # 91 Well. Even though the well logs showed oil sand of approximately 10 feet thickness, the well was plugged and abandoned because the sand was shaly and tight, the oil permeability too low and the water saturation of 70% too high. Based on their experience in the area and the available information of Coon's well, the consensus of opinion among Placid's experts was that the K-3 Sands were unable to produce oil at the Kelly # 2 Well because the oil was too viscous, the water saturation too high and the sand too unconsolidated.
Plaintiffs emphasize studies of D.L. Duggan, a respected petroleum engineer who worked for Placid's predecessor for years in the Rogers Field, which classify the Cockfield K-3 zone as an oil bearing sand, and his optimistic 1963 report regarding the oil potential of that sand. However, Duggan's report also noted that prior drillings into the K-3 stratum were consistently plugged as dry holes because of sand problems which made commercial operation uneconomical. Furthermore, despite Duggan's optimism that the sand problems could possibly be overcome with sand control techniques, Bodcaw, the company who employed Duggan, never completed a well at this level.
In connection with their assertion that the K-3 zone was uncommercial, Placid's experts highlighted their calculations of water saturation and severely criticized plaintiffs' experts much lower estimations as being unsupported by the evidence.
Peavy stated that the question of water saturation makes a significant difference in the determination of whether a well can achieve commercial production. He stated that a calculation of water saturation in excess of 60% would make him seriously consider whether a well could be productive and only with actual production in a comparable section or in that reservoir would he then attempt well completion. He testified that when he calculated the Cockfield K-3 water saturation from the well's electric log he concluded that the water saturation was 65%. Despite this and without the benefit of production logs on similar wells in the field, he ignored this calculated data, *1244 and without any basis, estimated water saturation at 39%.
In contrast to Peavy's estimation, Placid's experts Dale Branstetter and Hugh McDonald calculated from the electric log that the water saturations of the K-3 stratum were 65% and 60%, respectively. They both considered that the electric log is the proper method of calculating water saturation in the absence of actual production history in the reservoir. On the strength of their log calculations of water saturation in excess of 60% they concluded that the K-3 zone at the Kelly # 2 Well was commercially unproductive.
Plaintiffs stress that their experts' estimations of water saturation are in line with those of Duggan and Bobby Denton. This reliance is misplaced, however, because the documents clearly indicate that the water saturations of Duggan and Denton were estimated for the studies they suggested, not calculated. Even with the studies of Duggan and Denton, the plaintiffs still have not overcome the overwhelming weight of authority that calculated water saturations are more reliable, particularly in areas where actual production data fails to indicate otherwise.
Placid's experts also attacked Peavy's assumption that oil in the Cockfield K-3 zone is somewhere in the range of twenty degrees. It was agreed by the experts that oil gravities below twenty degrees adversely affect the capability to produce oil from the zone. The only core sample from the K-3 zone showed an oil gravity of eighteen degrees. In response to this data Montgomery, plaintiffs' expert, could say at best that oil gravity below twenty degrees does not eliminate the possibility of oil production.
Placid continued this line of attack when plaintiffs' experts projected oil production from the K-2 stratum.
Peavy's calculation from the electric log of the water saturation in the K-2 zone was 80% in the Kelly # 2 Well. Despite that, Peavy and Montgomery based their estimations of recoverable oil from this zone using a 40% water saturation. In contrast Placid's experts, Branstetter and McDonald, calculated water saturations at between 58.3% and 68.8% using the electric logs of all wells in the field which attempted completion in the K-2 zone. Faced with these high water saturation levels in the field, it is difficult to perceive how plaintiffs' experts could choose to abandon their calculations in favor of unsupported estimated water saturations.
From the outset of our discussion of the K-3 and K-2 zones we noted that the lack of production, not only by plaintiffs but also in the entire field, placed plaintiffs in a difficult position of trying to establish their damage claim. As far back as 1964 Bob Nelson, in a memo recommending termination of in-lieu royalty payments by Bodcaw on the Whatley tract, concluded that oil production in any of the Cockfield and Sparta Sands on the Whatley property (now, in part, the Kelly tract) could not be commercially produced because of the sand conditions. In light of plaintiffs' burden, coupled with the serious questions of whether these zones could have been commercially productive because of the high water saturations, the very fine grained sand structure and an oil viscosity which fell below twenty degrees, we are unable to state that plaintiffs have proven damages sufficient to justify an award. The evidence was purely speculative.
In awarding damages it is necessary for the injured claimant to prove his damages so that they are sufficiently removed from the purely speculative realm to the sphere of reality. We find that Coon and the Kellys failed to carry this burden regarding the three subterranean oil sands at the Kelly # 2 Well.
The only oil production shown to exist was in the Sparta S-2 zone. At this zone, the costs of sand control were so great that Coon abandoned his attempt at continued production. Return to the Sparta S-2 sand was conjectured; it was only possible that sand control techniques could be successfully attempted. In light of Placid's predecessor's unsuccessful use of sand control in the region and the high costs of the other *1245 methods Coon might have used, we cannot say that Coon and the Kellys bridged the gap between speculation and probability.
With respect to the K-2 and K-3 zones the plaintiffs had to show that although they had not produced any oil from these two sands, it was not too speculative to say that "but for" the blowout of Placid's rig, oil production in commercial quantities would have been achieved. The record does not support that "but for" the blowout Coon would have commercially produced oil. No one in the Rogers Field had been commercially successful in these zones; the sand was too fine, the oil too viscous and the water saturation too high.
Coon and his expert, Montgomery, admitted that in order to prove damages to the oil bearing strata at the Kelly # 2 Well bore, reentry into the well after the blowout was necessary. Coon stated:
"Well, I felt like that probably my well was damaged and reworking would have been the only way to have found out. But I was not sure that even reworking would prove anything. In other words, if I reworked it and I didn't have anything, well. I would still come out on the short end it would appear to me."
Montgomery said in response to the question posed by Placid's trial attorney:
"Q. Okay. If we assume that somebody would and that it is possible to redrill or to rework this well or rework the Kelly # 2 well for either of the three zones of interest, you really can't tell until you go back into that well or redrill it, the amount of damage if any, that was caused to each of those zones, can you?
A. That's true. That is true if you wanted to put a finite number on it you would have to do that.
A. That's what I just said. I agree with that."
Coon never attempted to rework the Kelly # 2 Well after the blowout, arguing that the ground in the vicinity of his well was too unstable to accommodate a workover rig, and that financially he could not have underwritten such an operation in which the loss of a workover rig was likely.
Placid contended otherwise, asserting that there was no cratering at the well bore of the Kelly # 2 Well, and that the closest cracking of the surface was 50 to 70 feet away. Placid further elicited testimony from numerous drillers from Justiss, as well as that of Shelby Loe, Jr., an independent driller, that their on-site inspections of the property revealed no surface instability which would prohibit redrilling.
To counter this argument Coon asserted that he contacted two drillers, Leroy James and Donald Manchester, and they were not interested in redrilling or reworking the Kelly # 2 Well. Leroy James was not called as a witness at trial; it was only through Coon's self-serving testimony that it was shown that Leroy James was not interested in redrilling or reworking the Kelly # 2 Well. Manchester testified that he had not made an on-site inspection of the Kelly Land after the blowout, that the only facts relative to the surface of the land near the Kelly # 2 Well were those told him by Coon, that he does no rework drilling, and that he did not remember whether Coon asked him if he would redrill the Kelly # 2 Well.
The record clearly shows the physical eruptions on the surface of the Kelly property as the result of the RGR # 4 blowout. However, the record is clear that special drilling techniques, i.e., the setting of support pilings, directional drilling, and the utilization of board matting, as well as soil compaction studies, may have been employed in a rework/redrill effort. We further note that soil compaction studies were not even used by plaintiffs to evaluate the feasibility of rework efforts. Since the plaintiffs did not ask for damages to the rig or for any additional expenses incurred for redrilling the Kelly # 2, we have no basis to restore the plaintiffs as nearly as possible to the drilling operation immediately prior to the blowout.
*1246 Accordingly, we find that the plaintiffs failed to prove their claim for loss of future income to a legal certainty, therefore, the trial court clearly erred in awarding damages based on purely speculative evidence.

KELLYS' DAMAGES
Placid contends that the trial court erred in awarding the Kellys $10,000 for surface damages. The Kellys, who live on the property they leased to Coon for mineral production, sought damages for cratering and cracking on their land, loss of trees and their vegetable garden, together with damages for having to leave their home temporarily, and mental anguish they experienced in connection with the blowout.
Placid expended in excess of $20,000 in filling the holes and cracks caused by the blowout. They argue that this expenditure adequately compensated the Kellys for any surface damage which may have occurred.
Robert M. Butler, an expert real estate appraiser who testified on defendant's behalf, observed that at the time of his onsite inspection of the property, well after the blowout clean up had been completed, there were three areas where additional settling occurred. In connection with this testimony the Kellys testified without contradiction they have been unable to keep their mobile home leveled since the blowout.
After a thorough review of the record, we cannot say that the trial court erred in making this award for surface damages.

JUSTISS' LIABILITY
The plaintiffs contend on appeal that the trial court was manifestly wrong in absolving Justiss from liability for the blowout.
The trial court concluded that the most probable cause of the blowout of the RGR # 4 Well was the failure to use adequate mud weight in the drilling of the well. In dismissing plaintiffs' claims against Justiss, the trial court concluded:
"The evidence clearly established that the fourth and final event was caused by inadequate mud weight in the drilling fluids. The failure to employ sufficient mud weight was the cause of the blowout and was the proximate cause of all damages suffered by the Kellys and Mr. Coon.
The evidence reflects that while Justiss crews were performing the work with Justiss equipment, Justiss Oil Company was merely an independent contractor functioning under complete control of Placid supervisors. Decision making authority concerning mud weight was vested solely in the hands of Placid supervisors. Because all control was contractually retained by Placid and a Placid field supervisor was present and in actual control when the fourth kick was experienced, no liability rests with Justiss Oil Company employees and all demands against it are rejected."
The plaintiffs' argument is twofold: (1) Justiss crews failed to report two kicks which preceded the blowout: and (2) Justiss employees failed to follow company policy which required filling the hole on trips out of the hole with drilling mud after each stand of pipe was pulled. We find no manifest error in the trial court's resolution of the issue of liability.
The following testimony of W.L. Davis, Placid's assistant area superintendent, described the relationship between Placid and Justiss:
"Q. What was the relationship between Placid and Justiss with respect to this well? What basis was the well being drilled on for Placid by Justiss?
A. Justiss Oil was a third party or was on contract to Placid to drill this well.
Q. On what is normally referred to as a day work contract?
A. Yes, sir, I believe that's right.
Q. And explain what this means in the industry?

A. Briefly, generally that means that the rig of Justiss and their labor and the equipment directly associated *1247 with the rig is rented on a daily basis to perform the task of drilling the well.

Q. It is rented to Placid?
A. That is correct.
Q. And Placid assumes control and responsibility for the rig and the crew?
A. Essentially, yes, sir.
Q. You exercise your authority over the rig, you have a drilling foreman as the company man on location?
A. Normally, yes sir.
Q. And with respect to R.G.R. No. 4, that was Mr. Keene?
A. I believe that was right part of the time, yes, sir.
Q. Mr. Julian Keene?
A. Yes, sir.
Q. So he had control of the rig and control of the hole and made the decisions with respect toand had responsibility for complete drilling of that well ...
A. Mr. Keene was our on site supervisor at the time of the blowout or when the blowout first occurred. Mr. Keene was the man on location and of course he would have the responsibility for making judgment decisions as were required at the moment on the job. Although he worked under supervision and followed orders from other people that were actually more responsible for the job.
Q. But these would be Placid employees who were Mr. Keens's supervisors?
A. Primarily, yes, sir.
Q. Placid through Mr. Keene and its line of authority had complete responsibility for successful drilling of the well through completion into production or if not completed after drilled, then through plugging and abandoning.
A. Well, he was the on site supervisor. He wouldn't have the ultimate responsibility for completing the drilling project all alone, no, sir.
Q. But Placid had that responsibility and it exercised it down the chain of command ultimately to Mr. Keene?
A. I believe that would be correct, yes, sir."
It was uncontradicted that Placid, through Julian Keene, its on-site representative, had full authority over all phases of the drilling operation of its RGR # 4 Well inclusive of decisions relative to the choice of the weight of the drilling mud.
Plaintiffs argue that Justiss was independently negligent in failing to follow company policy which required filling the well hole with drilling fluid each time a stand of pipe was removed. Under this line of reasoning it was incumbent upon plaintiffs to establish that Justiss had such a policy.
In reviewing the testimony of the Justiss drillers, the preponderance of the evidence was that company policy only required that the hole be kept full. This they said was accomplished normally by pumping drilling mud into the hole after three to five stands of pipe had been pulled. The only exception to this was the testimony of R.E. Farley who expressed only his personal opinion that the hole should be filled as each stand of pipe is pulled.
The trial court concluded that Keene was present when the RGR # 4 Well experienced its third kick, the one just prior to the blowout. The evidence further shows that most probably Keene was also present when the second kick occurred. The record supports that Keene was aware of the kicks, and that he was on the scene at the time of the blowout. Since supervisory responsibility was charged to Placid's supervisor at the rig, and Justiss' employees worked under his direction, we cannot find any error in the trial court's determination that Placid was solely liable.

*1248 EXPERT WITNESS FEES
The trial court taxed Placid with expert witness fees incurred by plaintiffs in the amount of $24,000.55. Placid argues on appeal that this sum erroneously included time the experts consulted with plaintiffs during trial after the conclusion of their testimony.
Two of the expert witnesses whose fees were taxed as costs, Peavy and Montgomery, dealt exclusively with the question of reservoir damages. Only Meredith's testimony centered mostly on the cause of the blowout and surface damages; his testimony regarding the availability of sand consolidation techniques was secondary.
LSA-C.C.P. Art. 2164 directs the appellate court to tax the costs of the lower or appellate court against any party to the suit, as in its judgment may be considered equitable. After careful consideration we have amended the trial court's judgment to delete its award of damages to the subterranean oil sands. Because of this we feel constrained to likewise excise the expert fees of Peavy and Montgomery from the judgment since their testimony directly related to the now deleted damage award.
On the other hand the trial court fixed Meredith's expert fee at $9000, basing its award on his total bill to plaintiffs for consultation and expert testimony. The bulk of Meredith's testimony focused on the cause of the blowout, the physical effect of that blowout on the geological formations, and Placid's liability.
An award for an expert's fee is generally within the discretion of the trial court and will not be upset in the absence of an abuse of discretion. D'Angelo v. New Orleans Public Serv., Inc., 405 So.2d 1262 (La.App. 4th Cir.1981), writ denied, 407 So.2d 748 (La.1981). A witness who testifies as an expert in a trial is entitled to additional compensation fixed with reference to the value of time employed and the degree of learning or skill required. Such an expert is entitled to reasonable compensation for his court appearance and for his preparatory work. State v. Donner Corporation, 236 So.2d 841 (La.App. 3rd Cir. 1970). On the basis of this criteria the trial court has the authority to fix expert fees either by rule or from testimony adduced at trial. LSA-R.S. 13:3666; LSA-C.C.P. Art. 1920; Wetzka v. Big Three Industries, Inc., 409 So.2d 393 (La.App. 4th Cir.1982).
Meredith's charges reflect extensive preparatory time and time spent providing testimony at trial. In addition Meredith was also called as a rebuttal witness. Placid's major objection to the trial court's award was the sum granted Meredith for time spent at trial between his testimony in plaintiffs' case-in-chief and his rebuttal testimony. Much of Placid's evidence was held under protective order during the discovery phase of litigation and was heard for the first time at trial. Under these circumstances, we find the intervening time Meredith spent in the courtroom between his initial testimony and on rebuttal necessary and reasonable for the successful portion of plaintiff's case, therefore, taxable as costs. Accordingly, we find no abuse in the trial court awarding Meredith his total bill.
For the foregoing reasons, the judgment of the trial court is reversed as far as it awards damages to plaintiffs for loss of production from the subterranean oil strata at the well hole of their Kelly # 2 Well. The trial court's judgment finding Placid liable to the Kellys for surface damages is affirmed. The trial court's judgment awarding expert witness fees to Peavy and Montgomery is reversed. All other portions of the trial court's judgment are affirmed. Costs of this appeal are assessed one-half to Placid and one-half to Coon.
REVERSED AND RENDERED IN PART; AFFIRMED IN PART.
NOTES
[*] Judge Hugh Ellis Brunson of the Fifteenth Judicial District Court participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.