576 So.2d 475 (1991)
MAGNOLIA COAL TERMINAL
v.
PHILLIPS OIL COMPANY.
Nos. 90 C 1646, 90 C 1663.
Supreme Court of Louisiana.
March 11, 1991.
Concurring Opinion March 15, 1991.
On Application on Denial of Rehearing May 23, 1991.
*476 James J. Coleman, Sr., Charles B. Johnson, Peggy Wallace, Henry Lazarus, Coleman, Dutrey & Johnson, Allan Kanner, Reuben A. Guttman, Joel Waltzer, Kanner & Guttman, P.C., Mack A. Barham, Robert Arceneaux, Lee A. Archer, Barham & Markle, for plaintiff-applicant Magnolia Coal Terminal.
Charles D. Marshall, Jr., David N. Schell, Jr., Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, William G. Paul, John L. Williford, Kenneth E. Rogers, David M. Whitney, Patrick H. Martin, for defendant-respondent Phillips Petroleum Oil.
George C. Gibson, Andre Phillips La Place, James Berry St. John, Jr., Craig Wyman, Robert T. Jorden, Charles B. Griffis, III, Chevron, U.S.A. Inc., Douglas A. Molony, CNG Producing Co., Malcolm Johns, Louisiana Land & Exploration Co., Frederick J. Plaeger, III, New Orleans, Sonat Exploration Co., Philip C. Wrangle, Houston, Tex., Texaco Inc., Shirley C. Friend, John D. Fitzmorris, Jr., New Orleans, Amoco Production Company, Millard E. Matthews, Jr., Houston, Shell Offshore Inc., Susan K. Carter, New Orleans, J. Patrick Batchelor, Commissioner of Conservation, State of Louisiana, George C. Gibson, New Orleans, Louisiana, Department of *477 Environmental Quality, Keith W. Petrie, Baton Rouge, amicus curiae.
Concurring Opinion by Justice Calogero March 15, 1991.
WATSON, Justice.
Seeking damages to a 2,200 acre tract of land, the plaintiff/owner, Magnolia Coal Terminal, alleges that defendant/lessee, Phillips Oil Company, and Phillips' predecessors, have: failed to control oil seepage from a well which was not properly plugged and abandoned; failed to properly clean up the well site; failed to restore the surface to its original condition; and failed to comply with statewide order 29-B of the department of conservation. Plaintiff's petition alleges both past and continuing damage to the property, which has resulted in a permanent diminution of its market value.
After this suit was filed on September 27, 1985, Phillips Petroleum Company (the current name of defendant) filed a motion to transfer the case to federal court on the ground of diversity of citizenship. Magnolia Coal Terminal is a partnership. One of the partners, International Tank Terminals Ltd., is a corporation which, like defendant, is organized under the laws of the State of Delaware. Because complete diversity was lacking, the case was remanded to the civil district court for the Parish of Orleans. See Carden v. Arkoma Assoc., ___ U.S. ___, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990).
Remand was ordered by the federal court on December 11, 1985, and trial in state court fixed for March 17, 1987. Phillips asked for a continuance on March 9, 1987, alleging that more time was needed for discovery. Trial was reset for May 26, 1987. On May 4, 1987, Phillips filed exceptions of no right and no cause of action on the ground that Magnolia had failed to exhaust its administrative remedies before the commissioner of conservation. The trial court overruled the exceptions and the court of appeal denied supervisory writs. This court denied supervisory writs on June 5, 1987.
The trial court heard evidence for thirteen days in May and June of 1987 and concluded that the oil well was still leaking and that Phillips had breached its contractual obligation to restore the surface of the leased premises. The trial court rejected Phillips' contention that plaintiff's only remedy was specific performance and awarded monetary damages. Calculating the cost of properly plugging the well at $2.1 million, the cost of clean up at $2.1 million and miscellaneous damages at $300,000, the trial court awarded total damages of $4.5 million.
The commissioner of conservation refused to defer to the ongoing proceedings even though this court declined review. After trial was concluded on June 22, 1987, the commissioner held a public hearing on June 25, 1987, in which Magnolia did not participate. Subsequent to the trial court judgment on September 3, 1987, the commissioner issued contradictory findings on March 11, 1988. The commissioner decided that the well had been properly plugged and abandoned; that the well was not leaking; and that Phillips should submit a plan for clean up and remediation of the site.
On appeal, defendant's exceptions of no right and no cause of action were sustained. Magnolia Coal Terminal v. Phillips Oil, 561 So.2d 732 (La.App. 4th Cir. 1990). The court of appeal concluded that resolution of the underlying factual issues in the litigation: whether the well was properly plugged; whether it was leaking; and what procedures should be followed for clean up and remediation of the site were within the exclusive original jurisdiction of the commissioner of conservation. A writ was granted to review the judgment of the court of appeal. 568 So.2d 1068 (La.1990).

FACTS
The tract is situated in Plaquemines Parish, Louisiana, about halfway between New Orleans and the mouth of the river. A strong consideration in Magnolia's purchase was the property's 2.2 mile frontage on the Mississippi River. Magnolia obtained an option to purchase the property on March 13, 1981, for $655,000 and subsequently renewed the option for an additional $655,000. Magnolia acquired title on December 23, 1981, paying $6.5 million in a cash sale, with the original owners, the Vaccaro and D'Antoni families, retaining the mineral rights. Under the mineral lease on the property: "Lessee shall pay for all damages caused by Lessee's operations, including damage to ... soil and other property...." (P-136)
The sale of the tract to Magnolia was negotiated by attorney Frank LaGarde. During the option period, LaGarde said the prospective purchasers became concerned about oil on the property. At a meeting on July 14, 1981, representatives of Aminoil USA, Inc., Phillips' predecessor, which later merged with Phillips, agreed to rectify the problems at the site. The Aminoil personnel *478 said that the well had never been properly plugged and abandoned and they were going to take care of the problem. In a letter dated July 17, 1981, Aminoil acknowledged responsibility for properly plugging the well and cleaning the property. In pertinent part, the letter said:
"During the course of our conversation July 14, 1981, in the office of Mr. Frank LaGarde, the following agreements were made relative to Aminoil's cleaning up the surface location of the State Lease 2513 Well, to wit:
1. That Aminoil will, in a good and workmanlike manner, proceed with its efforts to plug and abandon said well. It was noted that Aminoil is currently studying the engineering problems involved in such operations but will move forward on the project with all expeditiousness ...
* * * * * *
3. That Aminoil will proceed with all due diligence in draining all of the pits for said well and restoring the surface of the property to a usable condition. The problems involved with such restoration were discussed and it was recognized that it may take Aminoil up to two (2) years to complete this operation." (P-6 and P-49, duplicate exhibits)
Because it has adjacent deep water navigation, the property is an outstanding industrial site. Construction bids for a coal terminal were obtained in the spring of 1982. The total cost of the facility, including capitalized interest, land cost and working capital, was projected at $86 million. Magnolia spent $3,828,000 for engineering and other preliminary construction costs.
Ingram Industries, one of the partners in Magnolia Coal Terminal, had guaranteed $43 million of the letter of credit involved in the terminal project. The company will no longer undertake such a guarantee because the danger of spontaneous combustion in coal, a significant problem in any coal facility, is increased by the oil pollution. It is impossible to store coal in an oil polluted area.
There are two major coal terminals in the New Orleans area and a third bulk terminal. There is an International Marine terminal just above the Magnolia location. Ingram Barge Company operates coal barges and would benefit from having its own terminal. With its own terminal, Ingram's barges would receive preferential treatment which would reduce demurrage costs, the holding charges.
The terminal proposal had anticipated fleeting 107 barges in the river adjacent to the property. It would be dangerous to do that in the presence of leaking oil. Without absolute assurance that oil is not leaking or traveling underground, it is impossible to insure, finance or build a coal terminal on the property.
Waldemar S. Nelson, chairman of the board of a firm of consulting engineers, testified as an expert in engineering with extensive experience evaluating waterfront sites for marine facilities. A stable river bank, adjacent deep water and a long straight shoreline comprise an ideal industrial riverside terminal location. Nelson's company designed this terminal and many plants on the river for major companies, including Dow Chemical, Exxon, Union Carbide, and BP Oil. The company has designed several coal facilities and did the design to convert Freeport Sulphur's Port Sulphur terminal to a coal terminal.
A commercial coal terminal requires a large storage area because it is necessary to separate the commodity by owners and also by grades. This project, designed to have ground storage for a million tons of coal, was to be a major terminal capable of handling 12 million tons of coal a year, primarily exports barged from the inland coal fields, transferred to storage and then loaded on ships.
Robert W. Merrick testified as an expert real estate appraiser and broker with an MAI designation. In 1980, when he took the Magnolia representatives to look at potential sites for a coal terminal, crude oil was selling at $35 a barrel and there was intense interest in the development of coal as an alternative energy source. In 1982, the coal bubble burst when the price of crude oil dropped. Merrick said that the Magnolia property is a desirable industrial site because of its two and a half miles of straight river frontage, lack of batture and deep water adjacent to the levee. He estimated the 1987 value of the tract at $2.2 million.
*479 Construction of the terminal was halted in the spring of 1982 because none of the major contracts could be completed. Australia and China are the major world sources of raw coal, but Australia is operating at capacity. The third largest exporter of coal is South Africa. If exports from South Africa are restricted or the price of oil increases, the coal terminal project will again become viable.
Approximately 1000 linear feet of Magnolia's river frontage is occupied by the site of well number one on state lease 2513. The well is located near the Pointe-a-la-Hache ferry landing at the narrow upstream end of the Magnolia property. The well was completed on August 6, 1960, by U.S. Oil of Louisiana, Inc., one of Phillips' predecessors. It was described as having two lengths of tubing inside a casing. One string of tubing, the long string, reached the K-6 sand. The other string of tubing, the short string, reached the K-2 sand.
On September 29, 1964, there was an explosive blowout of the well from the K-6 sand. Neither Halliburton's well control unit nor Red Adair, a world renowned expert on blowouts, could control the problem. Halliburton pumped 2800 barrels of heavy drilling mud down the hole, but a lateral opening in the long string allowed the mud to escape. At the surface, a large volume of gas, water, oil and mud escaped and a crater developed about 200 feet across and 220 feet deep. The blowout was brought under control by a relief well drilled in December of 1964.
Leonard Casey, field foreman for U.S. Oil of Louisiana when this well was drilled and now an employee of Phillips, was present when the crater formed at the well head. Casey observed drilling mud being pumped down the long string into the well for eight or nine days and saw it return into the crater. In addition to the drilling mud, 350 to 400 barrels of oil and twice that much saltwater flowed into the crater daily for a total estimated volume of 16,670 cubic yards. Oil was siphoned out and burned twice in the area of the crater. Some of the fluid in the crater was pumped into the river until the state objected. Four spoil pits were dug. The crater's mixture of liquid drilling mud, salt water and production oil, which was working its way to the surface, had a pudding consistency.
Kenneth G. Martin testified as an expert in geology with extensive education and experience. After the relief well was drilled, well number one was plugged with drilling mud. According to Martin, the drilling mud should have been followed with cement to make a permanent plug. Instead, the operator drilled to a gas sand near the blowout sand and started producing from that level, leaving the original well without a permanent plug. Inter-office correspondence from U.S. Oil of Louisiana, Inc. confirmed Martin's testimony that the relief well, "a Plugback" to the "Same Sand," had substantial gas production. (P-41) The gas well continued producing until June of 1971.
In 1977, Signal Petroleum, one of the interim lessees, responded to a request from the Plaquemines Parish Commission Council and filled the crater around the well with over 16,000 cubic yards of river sand.
In 1980, the well head was 55 feet deep and work on the well required a cellar. Ten valves were opened which leaked green oil. Since green oil is fresh oil, this was conclusive evidence to Martin that the well was leaking. It was still leaking at the time of trial 23 years after the blowout. According to the oil companies' own reports, it was not only leaking but leaking at the rate of one gallon per hour or a half barrel a day.
In 1981, an attempt to plug the well from the surface with cement was unsuccessful: "1 inch tubing was run in the long string to 7,518 feet and while attempting to pull out the 1 inch tubing it parted leaving 7,200 feet in the long string." (P-135, Pretrial Order of Stipulated Facts). In Martin's opinion, a surface plug with cement is impossible because pressurized oil is still present. Since the long string is open, the cement, like the drilling mud, went out laterally at the point of least resistance.
Martin said 150 foot bore holes in the area prove the well is still flowing. There *480 is oil contamination of the site a half mile away from the well head. Martin said the K-6 sand is still capable of blowing out because it has high pressure, which causes the leaking oil to rise to the surface. An inter-office communication from Aminoil of Louisiana, Inc., dated July 17, 1980, states: "No other well has produced from this K-6 reservoir and one must assume this zone still has as much pressure as when it was killed and is still capable of blowing out." (P-42) Plugging efforts are also hampered by kinks in the seven inch casing at approximately 20 feet and 60 feet.
Aminoil abandoned its efforts to plug the well on January 3, 1983, after expenditures of $690,756. Four and a half months later, an eight to ten foot cellar was dug around the well head. Gas flowed into the cellar at the rate of 336 cubic feet a day and is still coming to the surface, demonstrating its presence by bubbles in the water covered areas.
At least 600 barrels of oil were recovered between October 21, 1983, and July 13, 1984, less than a year's time. Aminoil completed its clean up operation on August 5, 1984, but oil pockets appeared on the surface in November. In a letter to the Louisiana Department of Conservation dated January 17, 1985, Phillips admitted oil was still seeping to the surface from an unknown source. (P-106)
On March 22, 1984, the U.S. Coast Guard made a water pollution violation report regarding oil in the marshy area of the site which was draining into the Mississippi river. On August 31, 1984, the U.S. Corps of Engineers sampled the area and found combustible gas in four places.
Martin said it is impossible to clean the well site while the well is still leaking. In Martin's opinion, the well was never properly plugged, was never sealed and is still leaking. Properly plugging the well will require isolation of a work area with sheet pilings 100 feet deep to remove the kinks in the casing. The well should be plugged at the K-6 sand, the K-2 sand and the surface. The cost would be approximately $3 million.
Charles Campbell was employed to look at the property in February of 1986. Campbell and the president of his company used an excavator, which is a hydraulic self propelled backhoe similar to a drag line, to dig into the black areas. The spots were outside the levee, which had been built for oil containment, and varied in diameter from four feet to over 100 feet. In the first spot, the excavator hit water and oil seepage at a depth of about two feet. After digging to a depth of four or five feet, the water became covered with a thick layer of black oil. At another spot, an oily mud, which appeared to be oil mixed with waste drilling mud, appeared at a depth of three feet. On March 28, 1986, they went downriver, dug into the largest black spot and found what appeared to be crude oil seepage at a depth of approximately 33 feet. When they returned to the first spot, the crust of the surface broke and the excavator sunk about four feet into the ground. The track of the excavator filled with oil. A bulldozer had to extricate the excavator. Green oil was sucked out of the pit areas with pumps: 140 barrels were sold to Murphy Oil Company for $12.14 a barrel, the spot price at the time. Approximately 100 barrels of additional oil were reclaimed from other spots.
Ellison T. Gordon, an expert in oil field waste processing, is chairman of the board of Zallco Pollution Control. His company treats waste oil and has cleaned over 300 oil pits for major companies such as Superior Oil, Shell, Conoco, Chevron, Union, Gulf and Amoco, as well as for independent operators. He and his son examined the site and observed black spots "all over the place." When they dug a hole four or five feet deep, oil came into the hole, rising at the rate of a quarter of an inch every hour. It was green oil, new oil, not old oil.
Just before trial, Gordon returned to the site. Oil was bubbling to the surface in three spots, which were in a line pattern leading downstream toward the balance of the property. Gordon estimated the price of cleaning the area at over $30 million, using on site thermal incineration. The process would cost $25,738,952, incinerating 1000 cubic yards a day for about 420 working days. Because 50 percent of the waste is water, it would be necessary to refill with dirt, at a cost of $3,457,690.83.
Webb Jay testified as an expert in chemical engineering with a specialty in the drilling, *481 production, plugging and cleanup of oil and gas wells. He inspected the well site twice, once in 1985 and then on December 30, 1986. In Jay's opinion, the well has not been properly plugged. The ground showed continuous seepage of fresh crude oil, which Jay believed to be coming from the well bore. The relief well only effected a temporary plug and the well is still leaking. According to Jay, no cement ever reached the perforation point where oil and salt water are mixing. Jay has drilled fifteen to twenty wells within a five mile radius of this well. None of the other wells have seepage around them. In Jay's opinion, the cost of properly plugging the well would be $2 million or more. Jay Engineering, Inc., gave a three phase cost estimate in January, 1985, of $2.1 million. (P-141) Jay said it is a high risk job which he would not guarantee at any price. In his opinion, the bottom hole pressure at the well is sufficient to cause the present flow from the well of less than a barrel per day.
Richard B. Adams testified as an expert in geotechnical engineering, groundwater assessment and oil field site investigation, describing himself as an environmental problem solver. Adams said there is serious contamination throughout the tract and an impregnated contamination zone around the well crater. The borings indicate contamination laterally and to a depth of 350 feet: the source of all the contamination shown by the borings is the well blowout. The groundwater at the site is contaminated.
Dr. Robert C. Weaver testified as an expert in environmental, chemical and petroleum engineering with expertise in regulatory policy enforcement and reservoir engineering. He is a former dean of the College of Engineering at the University of Tennessee. Weaver first investigated the Magnolia site in 1980 when he was working with the Department of Natural Resources. He next visited the site on November 20, 1984, and has visited the site at least once a month since that time. Employed by Gulf South Research Institute, he worked part time with Magnolia on a fee basis until he was engaged as a full time consultant.
Dr. Weaver took videotape records on three visits to the site. A twelve minute edited synopsis depicts the scope of the contamination and reflects the way the property looked May 22, 1987, on Weaver's last pretrial visit to the site. Oil is spreading to the surface in various random pathways. The radius of the pattern is expanding to the south in the general direction of the groundwater flow. In Dr. Weaver's opinion, the pollution has to be coming from the well, which is not properly sealed.
Department of conservation order 29-B recommends that a perforation of a reservoir be cemented. In Dr. Weaver's opinion, the mud did not provide a satisfactory permanent plug because it eroded. The well still needs to be plugged at the perforation of the K-6 reservoir. The Magnolia tract cannot be cleaned until the well is successfully plugged because there is a continuing source of contamination. The core borings document contamination running 1200 to 1500 feet downstream from the ferry road in an area about 300 feet wide. In the crater area, the contamination extends to a depth of 60 feet. The balance of the area is contaminated to a depth of 15 feet.
In Dr. Weaver's opinion, on site incinerator would be the preferred technology for cleaning the property, at an estimated cost of $30 million with a 50 percent contingency allowance or $45 million.
The trial court found the testimony of experts Martin, Jay and Weaver plausible and convincing. The record fully supports this finding.
William J. Clark, III, formerly operations manager in Baton Rouge for the Louisiana office of conservation, testified as an expert on the rules and regulations of that office which affect oil drilling. Prior to January 20, 1986, when the rules were amended, the office of conservation did not regulate the closure of pits containing nonhazardous oil field waste. Under the new rules, order 29-B requires that a well be plugged with 100 feet of cement at the perforated interval and a 30 foot surface plug. This well was not plugged according to order 29-B.
Marsha Barnett, an employee of Phillips Petroleum, testified that she is a compliance clerk and prepared a plug and abandon report on this well for the Louisiana department of conservation. The report was not filed until 1987, after the effective date of order 29-B, although the well was *482 said to have been plugged and abandoned on March 22, 1983.
Bill R. Hise, who heads a consulting firm of petroleum engineers, testified that the well is not leaking from the K-6 reservoir. In his opinion, the well was successfully plugged; the oil present is old oil; and the pollution is primarily on the surface.
Dr. Gordon P. Boutwell testified as an expert geotechnical engineer and an expert in geohydrology. He conducted a study of the site between April 2, 1984, and trial. His tests and borings indicated that the well is not leaking, although he admitted a moderate contamination problem at the site. In his opinion, the well and pit areas are too distant from the remainder of the tract to affect the property's use for a coal terminal or any other industrial purpose. The maximum area requiring remediation is four or five acres. Although there is an area 50 or 60 feet deep at the crater which needs cleaning, the pits only need cleaning to a depth of six to eight feet. Boutwell recommended a recovery well to clean the area to a one percent standard.
H. Darryl Miller testified as an expert in environmental engineering. Prior to the enactment of order 29-B, there were no standards for oil field waste, which is specifically exempt from the federal and Louisiana hazardous waste regulations. In Miller's opinion, the maximum site area requiring treatment extends about 100 feet in diameter around the cone. The pit area should be remediated to an eight foot depth and the cone area to a ten foot depth. Miller said the best treatment would be biodegradation using microbes. Involved are 32,800 cubic yards which can be remediated in six to eight months at a cost of $1,409,000. Miller's testimony was based on cleaning to a one percent standard, which he described as acceptable in the industry.
Vinod Jindal, an employee of Phillips with a master's degree in petroleum engineering, became manager of Aminoil's onshore operations in 1981. After allegedly plugging the well, Aminoil, in a letter dated January 14, 1983, said it was not possible to give a time schedule for cleaning the surface of the site. (P-8) According to Jindal, no time schedule was given because Aminoil did not know the extent of the problem.
After Aminoil claimed the well had been plugged and abandoned, Jindal admitted observing oil seepage at the site. In fact, his company recovered 2300 barrels of oil from the site between September of 1983 and September of 1984. Subsequently, they recovered another 200 barrels. Jindal admitted that there are still some problems with oil seepage. Aminoil's clean up plan for the property included removal of the oil in the pits, knocking down the oil levees and leveling the ground to an industry standard. This superficial clean up was completed in October of 1984. The site was then monitored and new black spots appeared in November. A pit and some trenches were dug to accumulate the oil for removal. On December 26, 1984, a fence was put up by Magnolia, which stopped further clean up efforts.
Kenneth Moise testified as an expert in petroleum engineering with extensive experience in the clean up of oil well sites as an employee of Louisiana Land and Exploration Company. None of the thousands of wells with which he was involved on behalf of LL & E were ever left improperly plugged and leaking.
John T. Dade, an employee of Phillips, testified that the well site is sloppy looking with several pits containing oil and a soft area around the old well site. Aminoil used a gravity separation procedure to recover roughly 2300 barrels of oil and oil emulsion and approximately 800 gallons of water. The oil was sold as waste instead of crude because it had a lot of sediment. In October of 1984, Aminoil had removed all the visible oil and closed the pits. Dade looked at the property the week before he testified and admitted there was still some oil on the property. He had paced off a contaminated area measuring approximately 25 by 75 yards.
Dr. Peter Smith, a rebuttal witness for Magnolia, testified as an expert civil engineer specializing in environmental science and industrial site selection. Dr. Smith said that the cleared area is contaminated with oil to a depth of 15 feet. The crater area is contaminated to a depth of 50 or 60 feet. Dr. Smith made borings. Sample number six, taken 2,000 to 2,200 feet south of the well site, shows oil contamination of virgin, uncleared territory which could not have come from the surface. In Smith's *483 expert opinion, based on analysis of the soil, the well is the source of the contamination, which is spreading. Boring sample number five was taken approximately 100 feet into the woods south of the cleared area. It showed .18 percent of oil contamination.
On December 30, 1986, Waldemar S. Nelson observed oil around the old well site near the upriver end of the property. There was also extensive evidence of oil downriver extending to roadside ditches over two miles from the well site, near the end of the property. After sampling and testing, Nelson determined that the site could not be recommended for a coal terminal or any industrial purpose in its present condition.
At the conclusion of the evidence, the trial judge and counsel visited the site, accompanied by experts Boutwell and Weaver.

FACTUAL CONCLUSIONS
The testimony (fifteen volumes) and the exhibits (338) overwhelmingly support the trial court's conclusions that: (1) the well is not properly plugged and is still leaking; and (2) a substantial portion of the tract is contaminated with oil.

LEGAL CONCLUSIONS
The Louisiana constitution provides: "All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation or other rights." LSA-Const. art. I, § 22.
The judicial power is vested in the courts. LSA-Const. art. V, § 1. Except as otherwise provided by the constitution, the district courts have original jurisdiction of all civil and criminal matters. LSA-Const. art. V, § 16(A). Although the commissioner of conservation was a constitutional officer under the Louisiana constitution of 1921, that provision was not carried forward into the 1974 constitution. See LSA-Const. art. VI, § 1(C) of the constitution of 1921.
By Act No. 192 of 1990, enacted long after Phillips invoked a commissioner's hearing in this matter, the commissioner was given jurisdiction over site clean up of abandoned and unused wells. LSA-R.S. 30:4(C)(16)(a). The act clarifies any doubt about the commissioner's jurisdiction over site clean up prior to its enactment. In any event, monetary damages are within the exclusive original jurisdiction of Louisiana's courts.
Plaintiff's action for damage to its property is a matter of private law. See Moore v. Roemer, 567 So.2d 75 (1990) Magnolia's right to recover damages is a property right arising out of the original lease and attached to the property. Andrepont v. Acadia Drilling Co., 255 La. 347, 231 So.2d 347 (1969).
Because the commissioner cannot award damages, the question of plaintiff's damages is a matter for the courts. Compare O'Meara v. Union Oil Co. of California, 212 La. 745, 33 So.2d 506 (1947), where the only issues were overproduction and underproduction in violation of the conservation laws, and suit was not filed until the day before the commissioner's hearing was scheduled. O'Meara recognized other situations where the jurisdiction of the courts is appropriate.
The implied obligation of the mineral lessee to restore the surface is limited by a standard of reasonableness. See Bonds v. Sanchez-O'Brien Oil & Gas Co., 289 Ark. 582, 715 S.W.2d 444 (1986). However, this lease makes the lessee responsible for surface damage to the soil, and Phillips is the successor of the original lessee. Phillips' liability for damages is separate from its obligation to stop the leakage of oil. Although economic conditions caused Magnolia to defer construction of its coal terminal, this is still a prime industrial site, which Magnolia has been unable to use, sell or develop for any purpose from its purchase in 1981 until the present.
The lease imposes an express obligation which is a matter of contract not within the purview of the mineral code.
*484 See, for example, Clement v. Marion Corp. 398 So.2d 130 (La.App. 3d Cir.1981); Street v. Equitable Petroleum Corp., 532 So.2d 887 (La.App. 5th Cir.1988), Edwards v. Jeems Bayou Production Co., 507 So.2d 11 (La.App. 2d Cir.1987); Broussard v. Waterbury, 346 So.2d 1342 (La.App. 3d Cir. 1977) writ denied, 350 So.2d 674 and Coon v. Placid Oil Co., 493 So.2d 1236 (La.App. 3d Cir.1986) writ denied, 497 So.2d 1002. Breach of a contractual obligation to pay for surface damage to soil and property is not within the jurisdiction of the commissioner of conservation.
Since 1964, the successive mineral lessees have shown a callous disregard for the damage being inflicted on this property. See Cities Service Oil Co., v. Merritt, 332 P.2d 677 (Okla.1958). The result is a complex problem, which the records of defendant and its predecessors show can only be cured at great expense. This is not the ordinary case in which the lessee has caused minor soil damage. Enormous damage was proven to the soil of the leased premises. Oil and gas have been flowing from this well for over 26 years, and it is still not properly plugged. Even a conservative estimate of repairing the damage exceeds the property's present value. Under these circumstances, the trial court did not abuse its discretion in fixing those damages at $2.1 million, which is less than the current value of the property.
The court of appeal erred in deciding that Magnolia's damages cannot be fixed until the commissioner of conservation holds a new hearing. Damages from soil pollution are within the conventional knowledge and expertise of a trier of fact. See Marshall v. El Paso Natural Gas Co., 874 F.2d 1373 (10th Cir.1989).
Since this is an ongoing problem which has not been corrected, Magnolia has the right to seek future damages to the property. Any damages which may be proven between the time of trial and the plugging of the well are reserved.
Phillips and its predecessors have exercised their contractual rights as mineral lessees with an unreasonable disregard for the damage being inflicted on this tract of land. Not only the soil but the groundwater, the Mississippi river and the public have been damaged. See Save Ourselves v. La. Environ. Cont. Com'n, 452 So.2d 1152 (La.1984). There was an ongoing negligent failure to plug this oil well. LSA-C.C. art. 2315. Phillips is obliged not only to pay the contractual damages owed to the landowner but also to abate the nuisance by properly plugging the oil well. LSA-C.C. art. 667. See Hero Lands Company v. Texaco, Inc., 310 So.2d 93 (La.1975).
After being served in this matter on October 7, 1985, defendant Phillips sought removal to federal court. The case was remanded to state court on December 11, 1985, and set for trial on March 19, 1987. Phillips moved for a continuance on March 9, 1987, representing that additional time was necessary to complete its discovery. Trial was reset for May 26, 1987. It was not until May 4, 1987, after the original trial date, that Phillips filed its exceptions, claiming that Magnolia had failed to exhaust its administrative remedies. Cited in support of the exceptions was the language of the Louisiana Abandoned Oilfield Waste Site Law, LSA-R.S. 30:71, et. seq., which was not effective until July 10, 1986, long after the filing of this suit. That law only applies when "no financially responsible owner or operator ... can be located, or such person has failed or refused to undertake actions ordered by the commissioner...." LSA-R.S. 30:75(A)(4). This situation does not come within the Abandoned Oilfield Waste Site Law because there is a financially responsible operator. After the exceptions were overruled, a writ was denied by this court on June 5, 1987.
Despite the overruling of its exceptions, Phillips asked for a hearing before the commissioner of conservation. Phillips then participated in a hearing by the commissioner on June 25, 1987, after trial was concluded on June 22, 1987.
The evidence leaves no doubt that well number one on lease 2513 has never been properly plugged and abandoned. The trial court was correct in this factual finding. After the trial court rendered judgment, the commissioner made a contrary determination that the well had been *485 properly plugged and abandoned and was not seeping or leaking. This finding by the commissioner of conservation was based entirely on Phillips' evidence and is clearly wrong. By holding a hearing while this matter was under advisement in the trial court, the commissioner of conservation infringed judicial authority. Phillips is hereby ordered to seek a new hearing at which the commissioner is to consider this record and any additional evidence presented by the parties. LSA-Const. art. V, § 2.
The court of appeal correctly concluded that this record should be presented to the commissioner of conservation, who can order, monitor and supervise a plugging and abandonment of the well which will protect the public as well as the landowners. The jurisdiction of the commissioner of conservation, outlined in LSA-R.S. 30:4, extends to the plugging of oil and gas wells. Since the evidence establishes that this well has been leaking since 1964, the commissioner of conservation must determine at a new hearing what procedures should be followed to have the well properly plugged and abandoned. The parties are, of course, free to seek judicial review of the commissioner's orders.
For the foregoing reasons, the judgment of the court of appeal is reversed, and the judgment of the trial court is reinstated insofar as the trial court held that defendant is liable for damage to plaintiff's property in the sum of $2.1 million. Plaintiff's right to future damages from the time of trial until the well is properly plugged is specifically reserved.
The judgment of the court of appeal is affirmed insofar as it held that plaintiff had no cause of action to force proper plugging and abandonment of this oil well until the matter had been reconsidered by the commissioner of conservation. Defendant Phillips is hereby ordered to seek a new hearing before the commissioner of conservation in regard to the plugging of the well.
It is ordered, adjudged and decreed that defendant, Phillips Petroleum Company, be cast in judgment to plaintiff, Magnolia Coal Terminal, for the sum of $2.1 million, together with legal interest from the date of judicial demand until paid.
All costs are assessed to defendant, Phillips Petroleum Company. REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.
CALOGERO, C.J., and HALL and LEMMON, JJ., concur and assign reasons.
DENNIS, J., concurs in part, dissents in part and assigns reasons.
MARCUS, J., dissents and assigns reasons.
HALL, Justice, concurring.
The Commissioner of Conservation had concurrent jurisdiction of the issues involved in this case, and under the administrative law doctrine of primary jurisdiction the better procedure would ordinarily have been for the court to defer to the commissioner's exercise of its jurisdiction prior to adjudicating Magnolia's damage claim. However, since Phillips did not timely invoke the commissioner's jurisdiction, but waited until the eve of trial to do so, and because Phillips' exceptions filed in the district court were directed more toward exhaustion of administrative remedies than deferral, there was no abuse of discretion or error in the court suit going forward.
I have some question as to the proper measure of damages at this point, but 2.1 million dollars, which is less than the estimated 2.2 million dollar value of the property, is supported by the evidence. Magnolia and the administrative agencies are free to go forward with efforts to have the well properly plugged and the property cleaned up for conservation and environmental reasons. Magnolia may or may not be entitled to some additional damages at some future time, and its right to seek such damages is properly reserved.
LEMMON, Justice, concurring.
The majority correctly states that the Commissioner of Conservation has no jurisdiction to award money judgments or to adjudicate a mineral lessee's contractual obligation to pay for surface damage. Nevertheless, questions and complaints as to proper plugging of abandoned wells and remediation of oil contamination at the site normally should be first presented to the *486 Commissioner for an administrative decision as to appropriate orders necessary to protect the environment and the public. Under such a procedure, the district court is not divested of jurisdiction (as occurred under the statute declared unconstitutional in Moore v. Roemer, 567 So.2d 75 (La. 1990)), but the court's exercise of jurisdiction is simply postponed until the Commissioner rules on these issues. Use of the doctrine of primary jurisdiction in this type of case recognizes the need for orderly and sensible coordination between the courts and administrative agencies that have special competence and special regulatory duties involving the public good, and action by the agency may obviate the necessity of much of the court proceeding.[1]
The present case shows how the administrative scheme can break down. Not only did the mineral lessee fail to plug the well properly or clean up the surface oil contamination after the 1964 blowout, but also the then landowner failed to notify the Commissioner of the lessee's inaction. When the present owner filed this suit in 1985 to recover damages for the mineral lessee's continuing breach of its contractual obligations which began twenty-one years earlier, the successor to the original mineral lessee did not object for several years (until just before trial) to the landowner's failure to seek relief first from the Commissioner. Under these overall circumstances I concur in maintaining the district court's right to adjudicate the issues.
The majority apparently awards damages in the amount of $2,100,000 for defendant's breach of its duty to clean the oil contamination (and also orders defendant to seek another hearing before the Commissioner for the introduction of additional evidence on the adequacy of its plugging of the well). The most difficult problem with affirming the part of the trial court's judgment which awards damages for failure to clean up the oil contamination is that the landowner receives a money judgment with no restriction on the use of the money. Plaintiff is apparently free to use this money for purposes other than restoring the land, and the public is thus left unprotected. Moreover, the Commissioner has ordered defendant to clean up the site, and defendant is possibly exposed to paying twice for the restoration.
I agree that plaintiff has proved its entitlement to the award of damages, the record clearly establishing that the well has never been properly plugged and that the contamination is continuing. However, I would prefer for this court to formulate an abnormal solution for this abnormal situation, rather than a straight award of money damages as the remedy. Perhaps defendant should be ordered to establish a trust fund in a fixed amount to pay for the restoration of the land to be performed by a responsible third party under a bonded contract. Or perhaps some other equitable relief is more appropriate. In any event, the present relief may be insufficient to protect the parties, the public and the environment, and I would prefer to fashion more appropriate relief under the overall circumstances.
CALOGERO, Chief Justice, concurring.
As a general matter, environmental concerns and state regulatory policy would favor initial application to the Commissioner of Conservation in regard to the plugging of abandoned or unused wells. Such a procedure avoids the possibility that a landowner might use for other purposes the damages awarded to him for the improper *487 plugging of a well and oil contamination on his property, leaving an environmental hazard unremediated. Thus I would give close scrutiny to a district court judgment which assessed damages relating to that issue at the outset, bypassing the Commissioner.
In this case, however, the majority has addressed that concern by disallowing the damages awarded by the trial court for the improper plugging of the well on the plaintiff's property, and referring the matter to the Commissioner for appropriate resolution. Furthermore, the defendant did not object in a timely fashion to the plaintiff's failure to exhaust administrative remedies, and applied to the Commissioner only after extensive proceedings had taken place in the district court.
DENNIS, Justice, concurring in part and dissenting in part.
I agree that the courts should not delay the adjudication of this civil damage suit in deference to possible further administrative activity, but I cannot fully join in the court's opinion on the merits because it does not resolve the important legal issues presented by this case or finally determine the extent of relief to which the plaintiff may be entitled.
I respectfully concur in the court's decision overrulling Phillips Oil Company's exceptions of no right and no cause of action. Proper interpretation and application of the doctrines of primary jurisdiction, exhaustion of administrative remedies and other theories do not warrant the dismissal or delay of this litigation in deference to a proceeding before the Commissioner of Conservation.
Primary jurisdiction is a common law doctrine, wholly court-made, that is designed to guide a court in determining whether and when it should refrain from or postpone the exercise of its own concurrent jurisdiction so that an administrative agency may first answer some question presented. K. Davis, Administrative Law Treatise § 22.1 (2d ed. 1983) [hereinafter Davis]. Typically, the creation of an administrative body adds a new rule-making and law-applying authority to the legal system, with no explicit substraction from the previously existing power of courts. Consequently, agencies and courts are often considered to have concurrent jurisdiction. The doctrine of primary jurisdiction usually does nothing more than allocate power between courts and agencies to make initial determinations. Id.
In the present case, there is nothing in the Louisiana Conservation Act which purports to take away from the courts the jurisdiction to determine a controversy over a damage suit for wrongful pollution of private land or to make an administrative finding a prerequisite to filing a suit in court. La.R.S. 30:1, et seq. Indeed, the state constitution guarantees at least concurrent jurisdiction over such civil matters in the district courts. La. Const. Art. V § 16.
When a court and an agency have concurrent jurisdiction to decide a question, the most common reason for a court to cede primary jurisdiction to an agency is that the court finds it desirable to take into account the product of agency expertise before deciding the lawsuit. Davis §§ 22.1, 22.11. See, e.g., Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959). That reason does not exist in the present case. Damage suits of all kinds, including those involving harm to immovables, have long been the warp and woof of the caseload of the courts. The courts' experience and expertise in determining land values and in assessing and awarding reparation for damage to immovables is as great, if not greater, than that of the Commissioner of Conservation. The Commissioner possesses higher expertise on other issues of environmental and conservational concern, but these areas are only peripherially related to a lawsuit for damages.
The considerations that go into deciding when there should be exhaustion of administrative remedies before going to court are too complex for a concise, meaningful statement of when it is required and when it is not. Courts generally weigh the reasons pulling in each direction and decide whether requiring exhaustion is desirable. The basis of the court's decision is mainly judicial discretion rather than law because the factors pulling each way are usually plural, each is usually a variable, having differing degrees of strength or weakness, so that the court must weigh the combinations *488 of degrees of factors pulling one way against those pulling the other way, and the judge is typically limited to deciding on the basis of preliminary impressions. Davis § 26.1.
Yet the major factors that affect an exhaustion decision are identifiable. Pulling away from requirement of exhaustion are combinations of such factors as irreparable injury to a party from pursuing the administrative remedy, clear absence of the agency jurisdiction, clear illegality of the agency's position, a dispositive question of law peculiarly within judicial competence, the futility of exhaustion, and expense and awkwardness of the administrative proceeding as compared with inexpensive and efficient judicial disposition of the controversy. Davis § 26.1. Pulling toward exhaustion are combinations of such factors as the need for factual development, importance of reflecting the agency's expertise or policy preferences in the final result, probability that the agency will satisfactorily resolve the controversy without judicial review, protection of agency processes from impairment by avoidable interruption, conservation of judicial energy by avoiding piecemeal or interlocutory review, and providing the agency the opportunity to correct its own errors. Id.
In the present case, it cannot be said that the district court abused its discretion in deciding against the requirement of exhaustion. There is a clear absence of jurisdiction in the Commissioner to render a judgment either for or against damages and an apparent lack of jurisdiction or expertise to decide many of the preliminary issues of fact and law leading to such a judgment. To require exhaustion in such a case reasonably may have appeared to the trial court to be futile and to threaten the landowner with irreparable injury. On the other hand, it did not seem that the court's adjudication of the damage suit would interfere with the Commissioner's expertise or policy preferences, or impair the agency processes by avoidable interruption. Clearly, the Commisioner could not satisfactorily resolve the damage suit controversy without the need for further factual development and law application by the judiciary. cf. National Wildlife Federation v. Consumers Power Co., 657 F.Supp. 989, 25 E.R.C. 1812 (W.D.Mich.1987); Galaxy Carpet Mills, Inc., 255 Ga. 360, 338 S.E.2d 428, 24 E.R.C. 1108 (1986); National Audubon Society, Inc. v. Superior Court, 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709, 21 E.R.C. 1490 (1983); Green, Citizen Suits for Natural Resource Damages: Closing a Gap in Federal Environmental Law, 24 Wake Forest L. Rev. 851 (1989); Hodas, Private Actions for Public Nuisance: Common Law Citizen Suits for Relief from Environmental Harm, 16 Ecology L.Q. 883 (1989).
I respectfully dissent from this court's opinion on the merits pertaining to the measurement and assessment of damages. The trial court awarded the plaintiff a total of $4.5 million in damages. The court of appeal reversed the damage award. This court now reinstates the trial court judgment insofar as it holds the defendant liable for damage to plaintiff's property in the sum of $2.1 million, reserving the plaintiff's right to future damages from the time of trial until the well is properly plugged. However, this court fails to articulate clear reasons for its decision in this regard, leaving unanswered several important issues: What is the legal basis for the award of damages? In other words, is recovery being allowed for damages caused by defendant's breach of a conventional obligation, a delictual duty, an obligation of neighborhood, or on some other basis? Under the appropriate theory of recovery, what is the correct measure of damages? Civil Code artice 1995 provides that the measure of damages for failure to perform a conventional obligation is the loss sustained by the obligee and the profit of which he has been deprived. Other articles provide that an obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made. La.Civ.Code art. 1996. And that an obligor in bad faith is liable for all damages, foreseeable or not, that are a direct consequence of his failure to perform. La.Civ. Code art. 1997. And that when damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La.Civ.Code art. 1998. If these articles are applicable, either directly or by analogy, this court has failed to discuss whether the defendant's breach of its obligation or duty was in good or bad faith, to distinguish between foreseeable an unforseeable damages, or to specify in what respects the trial court abused its much discretion in assessing damages. If these articles are in no way applicable this court *489 has not stated what the applicable measure of damages is and how it applies in this case. Further, the court has failed to address a very important question much debated by the parties, and that is whether defendant's liability, like that of an expropriator, is restricted to the value of the property, regardless of the cost of remediating the pollution problem and restoring the property to its former condition.
After deciding, and correctly so, that the courts should not postpone adjudication of this case until the Commissioner of Conservation acts, this court should not shrink from performing its part in a complete litigation of this matter. In doing so, this court should resolve all of the questions of law necessary for a full and final determination and either enter a proper damage award on the record or remand the case to the court of appeal for it to perform this function. In the event that this court concludes that a proper award of damages should include the cost of remediating the pollution problem, equitable measures should be considered so as to prevent the imposition of duplicative liability on the defendant. For example, if the damages properly assessed were to exceed the value of the property and include remediation costs, this court should consider whether the defendant would be entitled to a credit against the remediation part of the judgment for any sums actually expended under a remediation program approved and supervised by the Commissioner.
MARCUS, Justice, dissenting.
I disagree with the majority opinion insofar as it affirms the trial court's award of damages prior to a determination of facts by the Commissioner of Conservation. A review of La.R.S. 30:1 and La.R.S. 30:4 indicates that the authority to order the plugging of wells and regulate seepage has been given to the commissioner. Along with this authority, "it is apparent that the Legislature has delegated to the commissioner of conservation, the authority to find the facts upon which the law is to be applied." O'Meara v. Union Oil Co. of California, 212 La. 745, 33 So.2d 506 (1947). Since the commissioner has not yet made proper findings of fact regarding the plugging of the well[1], the trial court had no authority to make such factual findings on its own, and any award of damages by the court was premature. I agree that certain damages (such as loss of use of the property and diminution in its value) sought by Magnolia were based on a clause in its lease and fell outside of the jurisdiction of the commissioner. However, these damages can not be calculated by the trial court until the commissioner first makes a determination as to matters within his jurisdiction. Accordingly, I would set aside the decision of the trial court and order the commissioner to re-open his hearing, reserving to the parties the right to seek judicial review of the commissioner's decision and judicial determination of damages.

On Application for Rehearing
PER CURIAM
Because some confusion was generated by the several opinions on original hearing, the court hereby clarifies the holding on original hearing, while denying both applications for rehearing.

Primary Jurisdiction
The deference to administrative agencies for an initial decision on matters within the expertise of the agency, which is contemplated by the doctrine of primary jurisdiction, is a matter within the sound discretion of the trial court. In the present case the trial court, in deciding the remediation issue, did not abuse its discretion by refusing to defer to the Commissioner of Conservation as a matter of primary jurisdiction.

Remediation Issue
This court on original hearing affirmed an award by the district court of $2,100,000 for the cost of cleaning up the contaminated area caused by the pollution for which Phillips was responsible. The award by the trial court was primarily based on the testimony of H. Darryl Miller, an expert in environmental engineering, who testified as to his estimate of $1,400,400 for remedying the damage which had been sustained as of the time of trial. The trial judge used this expert's estimate as to the extent of area damage and the cost of *490 remediation, but adjusted the estimate upward by fifty per cent.
This court found that the judgment was not manifestly erroneous as to the factual findings or an abuse of discretion as to the amount of the award. This court, however, reserved plaintiff's right to seek further damages for ongoing contamination which was continuing at the time of trial. It was very difficult to describe with particularity the area of damage, especially since the extent of the area of damage varied with the depth of the testing for damage. If plaintiff seeks additional damages in the future, the burden will be on plaintiff to establish that these damages were sustained after the judgment in the present case and were in addition to the damages for which plaintiff received an award in the present case. Under the particular circumstances of this case (which occurred because Phillips and its predecessors utterly failed over a long period of time in discharging their responsibility to plug the well and to clean up the damage to the property), Phillips is adequately protected by the imposition of the burden of proof in this regard on the plaintiff.

Plugging of Abandoned Well
This court ordered Phillips to reapply to the Commissioner to reopen the hearing on the proper plugging of the well, thereby affording plaintiff an opportunity to present evidence in this regard and permitting the Commissioner to issue appropriate orders relating to the proper plugging of the abandoned well. The Commissioner can adequately protect Phillips against any double payment which might occur if Phillips were required to perform cleanup operations for damages covered by the judgment in the present case. If the Commissioner fails to protect Phillips' interest in this regard, then Phillips has recourse to the courts to secure that protection.

Loss of Use
In its application for rehearing plaintiff contends that this court erred in failing to award damages for loss of use of the property during the lengthy delays created by the persistent failure of Phillips and its predecessors to perform its plugging and cleanup obligations.
The record simply fails to support plaintiff's contention that its inability to use the property for economic gain was caused by Phillips' failure to perform its obligations. It is at least equally probable that economic factors prevented plaintiff's construction of a coal facility, irrespective of any delays in Phillips' performance of its obligation, and plaintiff has failed to show any other use to which the property could have been put during the period in question. The trial judge correctly denied plaintiff's claim for loss of use. However, the ruling in the present case does not preclude a claim by plaintiff in subsequent litigation for loss of use caused since the date of trial by Phillips' continued failure to perform its obligations.
With these clarifications, the applications of rehearing filed by both parties are denied.
NOTES
[1] As the majority notes, the issues in the decision in O'Meara v. Union Oil Co. of California, 212 La. 745, 33 So.2d 506 (1947), which required exhaustion of administrative remedies, are distinguishable from the issues in this case. Moreover, La.Rev.Stat. 30:1 and 4 do not clearly require exhaustion of administrative remedies before going to court.

While the landowner's claim for damages under the mineral lease is cognizable in court, the doctrine of primary jurisdiction comes into play when enforcement of the claim requires the resolution of issues which, under the regulatory scheme, has been placed within the special competence of an administrative agency. United States v. Western Pacific Railroad Co., 352 U.S. 59, 63, 77 S.Ct. 161, 164-165, 1 L.Ed.2d 126 (1956). Because the type of complaints raised by plaintiff in this case address the interest of the public and the environment as well as the rights of the landowner, and because the type of issues adjudicated by the court in this case are interconnected with the regulatory powers of the Commissioner, the court under the doctrine of primary jurisdiction should normally postpone action until the Commissioner makes a designated determination, possibly making judicial proceedings unnecessary. 4 K. Davis, Administrative Law § 22.1 (2d ed. 1983).
[1] The commissioner did make a finding that the well was properly plugged. However, Magnolia did not participate in this hearing, since it apparently believed in good faith that the trial court was the proper forum. Given these unusual facts, I believe this finding must be set aside, and the commissioner ordered to reopen the hearing with participation by both parties.