Stephen H. KINNEY and Rocky Mountain Bluebird Ranch, a California corporation, Plaintiffs–Appellants,

v.

Raymond E. KEITH, Brenda M. Keith, Thomas K. Colbert, Virginia N. Colbert, and Mountain Gravel and Construction Co., a/k/a Mountain Gravel and Construction, Inc., a Colorado corporation, Defendants–Appellees.

No. 04CA1406.

Colorado Court of Appeals.
Div. V.

Dec. 1, 2005.

298

Jon Lewis Kelly, Cortez, Colorado; Charles G. Kinney, Oakland, California, for Plaintiffs–Appellants.

Dufford, Waldeck, Milburn & Krohn L.L.P., Nathan A. Keever, Grand Junction, Colorado, for Defendants–Appellees.

GRAHAM, J.

Stephen H. Kinney appeals from the trial court's judgment quieting title in the surface owners, Raymond E. and Brenda M. Keith and Thomas K. and Virginia N. Colbert, as to the gravel and sand located on the subject property (04CA0923). In addition, Kinney and Rocky Mountain Bluebird Ranch (collectively Kinney) appeal from the judgment entered after a bench trial in favor of the surface owners and their lessee, Mountain

Gravel and Construction Company, on Kinney's complaint for conversion and waste of gold (04CA1406). We consolidate these two appeals for the purposes of this opinion, dismiss that portion of the appeal in 04CA1406 regarding attorney fees, affirm both judgments, and remand the case in 04CA1406 for further proceedings.

## I. Background

We begin with a review of the procedural history.

Over a span of years and numerous conveyances, several surface estate owners in Montezuma County conveyed title to the surface and reserved title to the minerals. Ultimately, the chains of these titles became confused and broken.

Kinney owns a portion of the mineral estate in Montezuma County land. The Keiths and Colberts own the surface estate of the property as well as a small portion of the mineral estate. Mountain Gravel leased from the surface owners the right to mine gravel from the property, known as the Keith Pit, and later commenced operations. The layers of material in the Keith Pit are topsoil, overburden, gravel, basal sand, and the bedrock layer referred to as mancos shale.

Before Mountain Gravel commenced operations in the Keith Pit, the Keiths commenced a C.R.C.P. 105 action against Kinney and others to establish ownership of the common rocks, sand, and minerals in the Keith Pit. The Colberts intervened as plaintiffs. Kinney counterclaimed to establish the respective interests of all the parties in the sand and gravel, to quiet title to the minerals, and to adjudicate completely the rights of all the parties. He specifically alleged that the term "minerals" included sand, gravel, and "other aggregate materials."

In 1995, the trial court entered partial summary judgment, ruling that the gravel belonged to the surface estate rather than to the mineral estate (gravel judgment). However, this order did not define exactly where the surface estate ended and the mineral estate began. Kinney obtained a C.R.C.P. 54(b) certification of finality and appealed.

A division of this court dismissed the appeal, explaining that C.R.C.P. 54(b) certification was improper because "the action to quiet title here must address the interests of all of the parties in the sand, gravel, and other mineral deposits." *Keith v. Kinney*, 961 P.2d 516, 519 (Colo.App.1997) (*Kinney I*). The case was remanded to the trial court for a final determination of the other property interests and all the parties' respective ownership therein.

In 1998, while his petition for certiorari in *Kinney I* was pending, Kinney commenced a separate action against the Keiths, the Colberts, and Mountain Gravel for an accounting, conversion of the minerals, sand and gravel, and waste. The Keiths, the Colberts, and Mountain Gravel moved to dismiss on the basis that all claims in this case were raised or should have been raised in the quiet title action. The trial court dismissed all claims concerning sand and gravel based on the gravel judgment, stating that Kinney has "no right, title or interest in said gravel." The trial court did not address the lack of finality noted in *Kinney I*.

Next, the Keiths, the Colberts, and Mountain Gravel filed a motion for summary judgment on Kinney's claim for conversion of minerals. The trial court entered partial summary judgment in favor of the Keiths, the Colberts, and Mountain Gravel because Kinney failed to show that Mountain Gravel's operations constituted "a distinct unauthorized act of dominion or ownership exercised by one person over personal property of another."

Finally, the Keiths, the Colberts, and Mountain Gravel filed a motion for summary judgment as to Kinney's remaining waste and accounting claims. The trial court granted summary judgment in favor of the Keiths, the Colberts, and Mountain Gravel on the basis that, although waste could be considered "where there are concurrent owners of mineral interests," here "[Kinney] and [the Keiths, the Colberts, and Mountain Gravel] are not concurrent mineral owners." In reaching this conclusion, the trial court noted its previous determination that sand and gravel belong to the surface estate owners and are not a mineral interest, apparently

referring to the gravel judgment. Again, the trial court said nothing about finality in the quiet title action. Kinney appealed.

A division of this court reversed the trial court's judgment, explaining that the gravel judgment still lacked finality because it did not address the rights of all parties to gravel, sand, and other minerals in the Keith Pit, and therefore the gravel judgment could not be the basis of any of the trial court's three rulings. *Kinney v. Keith* (Colo.App. No. 01CA1573, June 6, 2002), 2002 WL 31082123 (not published pursuant to C.A.R. 35(f)) (*Kinney II*). To provide guidance to the trial court on remand, the division advised that an owner of a mineral estate need not prove recovery, sale, or separation of minerals to establish conversion and that "[e]ven small amounts of minerals found on the surface have been recognized as part of the mineral estate." The case was remanded to the trial court for a complete adjudication of the rights of all parties, including adjudication of the scope and ownership of the surface and mineral estates.

On remand, the trial court ordered all known interested parties to submit briefs and supporting documentation regarding their complete interests in any or all of the property. In 2004, the trial court issued its final judgment in the quiet title action, finding that the Keiths and Colberts owned the surface estate and have exclusive right to the sand, gravel, and other aggregate minerals which are part of the surface estate. The court also found that the Keiths, the Colberts, and Kinney, as owners of interests in the mineral estate,

> have rights to extract such minerals that comprise a separate and independent development of the Mineral Estate from the Surface Estate. Mineral Estate owners are to have reasonable access to extract such minerals, and have a duty to support the surface and to not interfere with the development of the Surface Estate.

In reaching its conclusion, the trial court looked at the chain of title to the property, including the mineral reservations contained in the deeds, and evidence of the original contracting parties' intent regarding their re-spective mineral reservations. Kinney appealed this judgment (04CA0923).

A bench trial was held on Kinney's claims for waste and conversion. At the start of the trial, Rocky Mountain Bluebird Ranch was joined as a coplaintiff because Kinney had transferred some of his mineral interests to the corporation and then leased back the right to mine those interests. The trial court found in favor of the Keiths, the Colberts, and Rocky Mountain Gravel on Kinney's waste and conversion claims. Kinney also appealed this judgment (04CA1406).

## II. Quiet Title Action (04CA0923)

Kinney contends that the trial court erred in concluding that sand and gravel are not minerals that are subject to his mineral estate, but are part of the surface estate. We disagree.

■ In a quiet title action, each party is required to assume the burden of establishing by competent evidence its title to the lands respectively claimed. *Gilpin Inv. Co. v. Perigo Mines Co.*, 161 Colo. 252, 421 P.2d 477 (1966).

### A.

The issue before us requires a brief examination of the ownership of the land in which the mineral interest is claimed.

The property consists of 345 acres in three parcels: section 2, section 11, and section 12. All 345 acres were used for ranching and farming.

Through a series of sales, transfers, and mineral reservations beginning in 1950, the surface of the parcels was conveyed separately from the mineral estate. By 1993, the Colberts were owners of the surface estate in section 12 and a portion of section 11, and the Keiths owned the remainder of the surface in section 11 and section 2. The Keiths also owned a percentage of the mineral estate in sections 2 and 11. The Colberts owned a portion of the mineral interests in section 12 and a portion of those interests in section 11. Kinney owned a portion of the mineral interests in all three parcels.

The reservations and conveyances of minerals designated percentage interests using various descriptive phrases, such as "in and to the oil, gas and other minerals lying in, on and under said lands," or "oil, gas and other minerals," or "[a]ll oil, gas, carbon dioxide, and any other minerals in, on, or under," or "[a]ll the minerals, oil, gas and other interests," or "one-half interest in and to all oil, gas and minerals lying in, under or upon said premises," or "all oil, gas and other minerals not previously conveyed."

### B.

■ First, Kinney argues that the reservations are not ambiguous and that as a matter of law sand and gravel are included in the mineral reservations. Because in his view the mineral reservations are unambiguous, he argues that the trial court erred in considering extrinsic evidence to determine the meaning of the term "minerals" in light of the intent of the original grantors. We are not persuaded.

■ Interpretation of a written document presents a question of law subject to de novo appellate review. *Bolser v. Bd. of Comm'rs,* 100 P.3d 51 (Colo.App.2004). We also review de novo the trial court's determination whether a document is ambiguous. *Roberts v. Am. Family Mut. Ins. Co.,* 113 P.3d 164 (Colo.App.2004) (*cert. granted* May 2, 2005, 2005 WL 1006492).

■ Our paramount purpose in construing any deed is to ascertain the parties' intent. Absent any ambiguity, the intent should be determined from the four corners of the instrument. Courts must take care to consider the entire deed, and not portions presented in isolated sentences and clauses. Reservations are construed more strictly than grants, and any ambiguities in a reservation are construed against the grantor. *Notch Mountain Corp. v. Elliott,* 898 P.2d 550 (Colo.1995).

■ Words used in a document are to be given their plain meaning by the court construing the document. *Buckley Bros. Motors, Inc. v. Gran Prix Imps., Inc.,* 633 P.2d 1081 (Colo.1981).

Kinney argues that the commonly understood meaning of "minerals" unambiguously includes sand and gravel. To support his argument, he relies on the dictionary definition of "minerals," which includes "an inorganic substance," "something neither animal nor vegetable," "a solid homogeneous crystalline chemical element," and "any of various naturally occurring homogeneous substances (as stone, coal, salt, sulfur, sand, petroleum, water or natural gas) obtained for man's use." Webster's Collegiate Dictionary 740 (10th ed.1998). However, "the word 'minerals' is 'used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case.'" *Watt v. W. Nuclear, Inc.,* 462 U.S. 36, 42–43, 103 S.Ct. 2218, 2222–23, 76 L.Ed.2d 400 (1983) (quoting *N. Pac. Ry. v. Soderberg,* 188 U.S. 526, 530, 23 S.Ct. 365, 367, 47 L.Ed. 575 (1903)).

■ "Minerals" is not capable of a definition of universal application; it is a general word susceptible of different meanings, and therefore, courts look to extraneous evidence to reveal the parties' intent, including the circumstances surrounding the reservation at issue. *N. Pac. Ry. v. Soderberg, supra; United States v. Hess,* 194 F.3d 1164 (10th Cir.1999) (applying Colorado law); *Bumpus v. United States,* 325 F.2d 264 (10th Cir. 1963); *McCormick v. Union Pac. Res. Co.,* 14 P.3d 346 (Colo.2000).

In apparent recognition of the fact that most parties to land contracts have little understanding of chemistry or geology, courts consistently have held that it is particularly important to discern what the parties jointly understood by the language they used, and to do that, it is necessary to consider all the circumstances surrounding the transaction. *Burkey v. United States,* 25 Cl.Ct. 566 (1992) (applying Colorado law). Courts have thus not only resisted using the term in the narrow geologic sense, but also decline to use it in the broadest sense to mean everything that is not "animal or vegetable." *Burkey v. United States, supra,* 25 Cl.Ct. at 578. What the word means, therefore, depends almost entirely on its immediate context. *Burkey v. United States, supra.*

There is a diversity of judicial thought on the recurring question of whether ordinary gravel and common sand, which are primarily used, as they are in the instant case, as aggregates in the mixing of concrete, are minerals. The general rule appears to be that gravel and common sand are not included within the meaning of the word "mineral" as that term is used in conveyances either granting or reserving mineral interests:

> Generally, the courts appear to find no intention on the part of those entering into a "mineral" conveyance to include ordinary building sand in the category of minerals unless there appears some positive intention to do so. This seems to be particularly true in areas where sand and gravel are common but where the most usual subjects of mineral conveyances are oil and gas. Also, where a large part of the surface is occupied by sand and gravel, the courts are likely to find that inclusion of these materials in the term "minerals" would tend to swallow up the surface grant.
>
> . . . .
>
> The general tenor of the cases considering whether gravel is to be considered as a "mineral" within the meaning of a conveyance reserving or granting minerals appears to be that since gravel is a material of much less value than most other mineral substances, and also is not peculiarly identifiable chemically from other substances, no intention to convey gravel will ordinarily be found in the absence of language or circumstances specifically indicating such intention.

A.G. Barnett, Annotation, *Clay, Sand, or Gravel as "Minerals" within Deed, Lease or License*, 95 A.L.R.2d 843, §§ 11, 13 (1964); *see also Harper v. Talladega County*, 279 Ala. 365, 185 So.2d 388 (1966) (conveyance of "all the coal, iron ore, and other minerals" does not include common sand and gravel); *Norken Corp. v. McGahan*, 823 P.2d 622 (Alaska 1991) (although gravel was commercially valuable resource, gravel rights—even where specifically granted or reserved in same clause as mineral rights—were not part of mineral estate, and express reservation of gravel rights did not, standing alone, permit

gravel to be removed as mineral in accommodation between surface and mineral estates, where gravel was essence of surface conveyed and its removal would result in destruction, not just use, of surface of property); *Bambauer v. Menjoulet*, 214 Cal.App.2d 871, 29 Cal.Rptr. 874 (1963) (gravel not a mineral in deed reserving "all mineral and oil rights" because commercial gravel has no definite chemical composition); *Farrell v. Sayre*, 129 Colo. 368, 270 P.2d 190 (1954) (where sand and gravel constitute the surface of the land, a straight mineral reservation does not reserve the sand and gravel); *Morrison v. Socolofsky*, 43 Colo.App. 212, 600 P.2d 121 (1979) (where gravel underlies topsoil of entire tract, surface owner purchased land for farming, and gravel removal would destroy the agricultural usefulness, parties did not intend to include gravel within mineral reservation); *Kinder v. La Salle County Carbon Coal Co.*, 310 Ill. 126, 141 N.E. 537 (1923) (court looked to the language of the grant or reservation, the surrounding circumstances, and the intention of the grantor to conclude that sand, gravel, and limestone, which could not be removed by mining operations underground without destroying the surface for agricultural purposes, are part of the surface estate); *Holloway Gravel Co. v. McKowen*, 200 La. 917, 9 So.2d 228 (1942) (sand and gravel not contemplated as reserved by a mineral reservation because such would be inconsistent with trade usage); *Witherspoon v. Campbell*, 219 Miss. 640, 69 So.2d 384 (1954) (if the term "minerals" was to include gravel, the conveyances should specifically so declare); *Salzseider v. Brunsdale*, 94 N.W.2d 502 (N.D.1959) (in a statutory reservation including fifty percent of all oil, natural gas, or minerals which might be found on or underlying land, the term "minerals" did not, in the ordinary or commonly understood meaning of the word when so used, include gravel); *Beck v. Harvey*, 196 Okla. 270, 164 P.2d 399 (1944) (conveyance or reservation using term "mineral royalty" does not include sand and gravel even when the property involved has sand and gravel susceptible of commercial production); *Heinatz v. Allen*, 147 Tex. 512, 217 S.W.2d 994 (1949) (sand and gravel used only for building and road-making purposes are not miner-

als in the ordinary and natural meaning of the word); *Atwood v. Rodman,* 355 S.W.2d 206 (Tex.Civ.App.1962) (gravel, being unexceptional in character, not considered a mineral within ordinary meaning); *Puget Mill Co. v. Duecy,* 1 Wash.2d 421, 96 P.2d 571 (1939) (the court refused to find that sand and gravel were included in the term "minerals" without having before it all the provisions of the conveyance and the reservation, so that it might determine the intention of the parties); *Miller Land & Mineral Co. v. State Highway Comm'n,* 757 P.2d 1001 (Wyo. 1988) (in action by owner of mineral rights against owner of surface rights and state which purchased gravel from owner of surface rights, trial court properly held that deed which specifically reserved to grantor mineral rights in land did not reserve right to gravel, because gravel was not a mineral within meaning of deed). *But see Sult v. A. Hochstetter Oil Co.,* 63 W.Va. 317, 61 S.E. 307 (1908) (the term "minerals" would include most materials under the surface, including gravel, subject to the intention of the parties).

▮ Colorado appears to follow the rule that general mineral reservations are inherently ambiguous in regard to whether sand and gravel are included. Kinney argues that ambiguity only arises where a large portion of the surface is underlain with sand and gravel, thereby making use of the surface impossible unless the reservation excepted sand and gravel. However, Colorado cases deem bare mineral reservations to be inherently ambiguous and favor resolving that ambiguity by looking to the intent of the grantor.

Colorado cases have directly addressed on two occasions whether a reservation of mineral rights implicitly includes a reservation of gravel or sand, and in so doing have found that the term "minerals," as it applies to surface minerals, is inherently ambiguous. *See Farrell v. Sayre, supra; Morrison v. Socolofsky, supra; see also McCormick v. Union Pac. Res. Co., supra,* 14 P.3d at 349–50 (although "Colorado adheres to the majority rule that deed reservation language reserving 'other minerals' reserves oil and

gas," there is no such settled law "with respect to sand and gravel").

In *Farrell,* the Colorado Supreme Court considered a 1941 deed that contained a general mineral reservation. The issue was whether the grantor of the surface estate had preserved his right to the gravel and sand under the reservation. The surface of the land consisted entirely of sand and gravel, and, at the time of the deed, the gravel had no commercial value. In holding that the reservation did not include sand or gravel, the court stated:

> It seems to be the general rule that where the surface of land is sand and gravel, a straight mineral reservation does not include the sand and gravel, and where a similar situation has arisen, the cases turn upon the intent of the parties at the time of the execution of the deed containing the reservation, when such reservation is in general terms, and virtually every decision is to the effect that where the grant in the deed, as here, is nothing but sand and gravel, it surely was not contemplated that the parties intended to nullify the grant without some direct specification in the reservation.

*Farrell v. Sayre, supra,* 129 Colo. at 372, 270 P.2d at 192. Thus, the court concluded that in cases involving surface gravel, a general mineral reservation clearly, as a matter of law, could not be said to include the gravel and sand. *Farrell v. Sayre, supra.*

In *Morrison,* a division of this court considered whether a deed reserving "oil, gas and other minerals" operated to reserve gravel where the entire surface of the property was underlain with gravel. The evidence showed that removal of the gravel would destroy the surface. The division opined that, because "[t]he reservation of 'all minerals' is inherently ambiguous," it must determine " 'what that word means in the vernacular of the mining world, the commercial world and landowners at the time of the grant, and whether the particular substance was so regarded as a mineral.' " *Morrison v. Socolofsky, supra,* 43 Colo.App. at 213, 600 P.2d at 122 (quoting *Farrell v. Sayre, supra,* 129 Colo. at 373, 270 P.2d at 193). The division found the taking of extrinsic evi-

dence appropriate in determining the intent of the parties and applied the rule construing reservations against the grantor and in favor of the grantee. *See Notch Mountain Corp. v. Elliott, supra; Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984) ("When an ambiguity is found to exist and cannot be resolved by reference to other contractual provisions, extrinsic evidence must be considered by the trial court in order to determine the mutual intent of the parties at the time of contracting."). Following the reasoning of *Farrell,* the division concluded that the mineral reservation did not reserve gravel:

> Though in *Farrell* ... the sand and gravel constituted the entire surface of the land, we find no distinction which would dictate a different result here, where the gravel underlies the topsoil of the entire property. Defendants' construction of the reservation could result in the destruction of the land surface and strip away its agricultural usefulness.

*Morrison v. Socolofsky, supra,* 43 Colo.App. at 214, 600 P.2d at 123.

The *Morrison* division concluded that to have reserved an interest in the gravel, the grantor was required to list it in the reservation clause. *Morrison v. Socolofsky, supra; see also Smith v. Moore,* 172 Colo. 440, 474 P.2d 794 (1970) (the reservation must be sufficient in clarity and certainty to qualify as a bargained-for reservation of the right to destroy the surface); *Evans Fuel Co. v. Leyda,* 77 Colo. 356, 236 P. 1023 (1925) (although the right to destroy the surface may be reserved, the reservation of such a right must be made clear and expressed in terms so plain that there can be no doubt). "*Morrison* can thus be said to extend the rule of *Farrell* in cases where removal of the underlying gravel would destroy the usefulness of the land's surface." *United States ex rel. S. Ute Indian Tribe v. Hess,* 348 F.3d 1237, 1245 (10th Cir.2003).

The Tenth Circuit has also examined whether gravel is a mineral included in a reservation. In *Hess,* the Tenth Circuit applied the two principles set forth in *Farrell* and *Morrison:*

> First, if a majority of the Hess family's property is underlain with gravel and such gravel cannot be mined without disturbing the property's surface, the general rule applies that a mineral reservation of all minerals does not include gravel. Second, that general rule can be overcome upon a finding that the parties to the contract nevertheless intended for the word "mineral," as used in the reservation, to include gravel.

*United States ex rel. S. Ute Indian Tribe v. Hess, supra,* 348 F.3d at 1246–47. The court then concluded that the Hess family presented evidence that its property was almost entirely underlain with gravel and that mining this gravel would disrupt use of the surface. The court also emphasized that the parties' intent suggested gravel was not included within the reservation, noting that the strongest evidence of the parties' intent was the government's own appraisal, which characterized the property's entire value as grazing, and the evidence that the gravel had no economic value in 1948, when the original grant occurred.

From these decisions, we can discern certain general principles. First, gravel and sand are not normally treated as minerals within the meaning of a general reservation of minerals clause. Contrary to Kinney's suggestion, this general rule is not limited to situations in which sand or gravel underlay the entire surface or where their removal would destroy the surface. Second, the intent of the grantors determines how gravel and sand are to be treated. In discerning that intent where, as here, the general word "mineral" follows an enumeration of specific kinds of minerals, courts have applied the maxim ejusdem generis, which means "of the same kind or species," to ascertain the meaning of the deed. Under the maxim, "where an enumeration of specific things is followed by a more general word or phrase, such general word or phrase is held to refer to things of the same kind, or things that fall within the classification of the specific terms." *Bumpus v. United States, supra,* 325 F.2d at 267. Because gravel and sand are not of the same kind or species as oil or gas, the general word "mineral" following that enumeration of specific minerals

would not, under the rule of ejusdem generis, be construed to include gravel or sand. *Bumpus v. United States, supra; Steinman Dev. Co. v. W.M. Ritter Lumber Co.*, 290 F. 832 (W.D.Va.1922) (under a deed granting all the coal, "iron ore and other minerals, and fire clay," it was held that the rule of ejusdem generis forbade that "other minerals" be construed as meaning all the sand, rock, shale, water, and earth to be found on the premises), *aff'd*, 290 F. 841 (4th Cir.1923).

Kinney asserts that *Farrell, Morrison,* and *Burkey* do not apply because the surface here does not consist solely of sand and gravel, the surface is not being destroyed or consumed by the mining of sand and gravel, the surface is being reclaimed and replanted for agricultural use, and the mining did not nullify the intent of the surface grant, but rather has allowed the Keiths and Colberts to profit at the expense of Kinney's mineral interest. Kinney urges that we adopt the reasoning set forth in *Watt v. Western Nuclear, Inc., supra,* which holds that gravel is a mineral. We decline to do so because *Western Nuclear* dealt with the intent of Congress in reserving minerals to the United States on public lands and has nothing to do with the parties' intent in private transactions.

We recognize that in *Western Nuclear* the United States Supreme Court declared that gravel is a mineral reserved to the United States in lands patented under the Stock–Raising Homestead Act of 1916 (SRHA). However, the Supreme Court specifically limited its holding to the statutory interpretation of the SRHA. Furthermore, the Supreme Court relied heavily upon the Congressional intent behind the SRHA, and other federal statutes dealing with mineral rights. *Western Nuclear* is therefore of little help in deciding the present case, in which those statutes do not apply. *See Rysavy v. Novotny,* 401 N.W.2d 540 (S.D.1987); *Miller Land & Mineral Co. v. State Highway Comm'n, supra.*

Kinney further argues that the original contracting parties' intent should not control our analysis because newly discovered minerals that were not known to exist in the area at the time of the original conveyances could never be conveyed as a mineral, but "would remain as a not-yet discovered-mineral that stays with the surface estate." This argument misses the mark. The term "minerals" has not been held to be inherently ambiguous with respect to oil, gas, gold, silver, copper, lead, and other similar subsurface materials, and therefore, those minerals would be included in the mineral estate even if the grantor did not know that they existed at the time of the mineral reservation. *See; Bumpus v. United States, supra; McCormick v. Union Pac. Res. Co., supra.* Just because a grantor did not know that a particular mineral existed on the property at the time of a conveyance does not automatically preclude that mineral from being included in the mineral estate. Indeed, there is no dispute here that gold is a mineral under the reservation language. Thus, Kinney's argument fails.

Although the general rule excludes sand and gravel from the mineral estate, we conclude that the trial court did not err in relying on extrinsic evidence of the original contracting parties' intent to determine whether sand and gravel were included in the mineral reservations, particularly in light of the allegations that sand and gravel did not underlay the entire surface of the parcels. We now review the extrinsic evidence to determine whether the trial court erred in determining on summary judgment that sand and gravel are not part of the mineral estates.

### C.

 Kinney asserts that there are genuine issues of material fact regarding whether the mineral reservations include sand and gravel. Again, we disagree.

We review de novo the trial court's summary judgment ruling. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.,* 901 P.2d 1251 (Colo.1995).

Under C.R.C.P. 56(c), summary judgment is proper only in the absence of disputed issues of material fact and where the moving party is entitled to judgment as a matter of law. We review all evidence properly before the trial court in the light most favorable to the nonmoving party, giving the nonmoving

party the benefit of all reasonable inferences that may reasonably be drawn from the evidence, and we resolve all doubts as to the existence of a material fact against the moving party. *Schold v. Sawyer*, 944 P.2d 683 (Colo.App.1997).

The Keiths and Colberts supported their motion for summary judgment regarding their gravel rights with the deposition testimony of Grace Pickens; her son Gilmer Pickens; Charles Wright, whose father was a party to both the 1950 Pickens deed and the 1963 Wright deed to the Williamsons; and Frank Garcia, who sold property to the Keiths and Colberts. Also before the trial court was surface owner Gawthrop's stipulation that his mineral rights did not include the right to remove gravel.

Grace Pickens testified that, at the time of the 1950 Pickens' deed to the Wrights, the property was used by the Pickens for ranching and that the Wrights bought it for the same purpose. She confirmed that she and her husband had no intention that the mineral reservation in the 1950 deed reserve to them an interest in the gravel. The Pickens had not mined any gravel on the property, and it was the understanding of both the Pickens and the Wrights that gravel mining was incompatible with irrigated farming and ranching. Neither party understood that the Pickens were selling their property, but retaining the right to mine gravel.

Charles Wright testified that the property at issue had been used by his family for ranching purposes and that it knew the Williamsons bought the land for similar purposes. No gravel had been mined on the property by the Wrights, and they did not consider the gravel to have any commercial value. Wright also testified that in the 1950s and 1960s gravel was not considered a mineral, like oil and gas. When the Wrights sold the property to the Williamsons, but reserved minerals, the Wrights had no intention of reserving a right to mine the gravel. Wright believed that gravel mining was inconsistent with using irrigated land for pasture and would destroy the irrigation, grade, and pasture land because the soil would have to be removed to access the gravel. Gilmer Pickens similarly testified.

Frank Garcia testified that his family would not have paid $450,000 for the property if it knew that the Wrights had reserved a right to remove the soil and mine the gravel. It was his understanding that the gravel on the land passed with the surface estate and was not a mineral right.

In addition, Peter Siegmund, the president of Mountain Gravel, filed an affidavit stating that: (1) gravel pervades the entire property; (2) in the 1950s, there was little commercial use for the gravel; (3) property used for gravel mining cannot also be used for ranching purposes because the top soil must be removed; (4) in his forty years of experience in the gravel industry, he has "never been aware of any situation, other than in this lawsuit, where anyone other than the surface owner claimed to own the gravel on or under the surface"; and (5) leases or purchases of gravel rights have always been from the surface owner of the property.

Based on this evidence, the trial court found:

[T]he property in dispute was used as ranch and agriculture land until the 1990s when the Keith and Colbert families began using it as a commercial gravel pit. In the 1940s, the Pickens and Gawthrop families had owned both the surface and mineral interest in their respective parcels, and had used their land exclusively for ranching and farming. They intended for the land to continue being used for ranching and farming after they severed the mineral rights from the surface rights in 1950 and 1951. And it was. Through the 1950s, 60s, 70s and 80s, the mineral estate interests never interfered with the surface ranching and farming interests.

When Congress enacted legislation in the early 1900s to segment mineral and surface estates in public lands, it envisioned a system that would "encourage the separate and independent development of the surface lands for agricultural purposes and the extraction of the mineral fuels as will best meet the needs of the people." ... The Pickens, Gawthrop, Wright and Williamson families, in continuing to use the surface estate for ranch and farm land,

envisioned the same separate and independent uses for mineral and surface estates.

There is nothing in the record to suggest that anyone in the chains of title ever changed their expectation that the mineral estate interest would not interfere with independent development of the surface lands. All mineral conveyances were for "oil, gas, and other minerals." The "ordinary and popular sense" of those terms, unless expressly stated otherwise, means "substances exceptional in use, in value and in character ... and does not mean the ordinary soil of the district which if reserved would practically swallow up the [surface estate] grant." ... Kinney's attempt to modify those terms in 1990 well after the grantors had already conveyed to him their mineral interests, does not change what they had originally intended to convey. The rights of all parties involved are distinctly fixed by the original deed and the reservation therein.

Kinney presented no evidence that refuted the testimonial evidence. Accordingly, the record demonstrates that the original contracting parties had no intention of reserving the right to remove gravel or other aggregate from the property. They knew of the presence of gravel on the property, but assigned no value to it.

Thus, although intent of the parties is generally an issue of fact that should not be resolved on summary judgment, *Schold v. Sawyer, supra,* here there is no disputed issue of fact that the original contracting parties, who are not parties in the quiet title action, intended the land to be used for ranching and farming purposes and did not intend that the mineral reservations include the right to mine gravel or sand. *See Burman v. Richmond Homes Ltd.,* 821 P.2d 913 (Colo.App.1991) (although the issue of a party's intent is a question of fact and is not an appropriate issue for summary disposition, the evidence was uncontested that plaintiffs waived their right to receive the title insurance policy commitment prior to closing).

Nevertheless, Kinney argues that summary judgment was improper based on the following arguments.

First, Kinney argues that the facts were in dispute as to the damaging effects gravel removal would have on the surface estate. Specifically, he stresses that the property could have been reclaimed from gravel mining in 1995 and that part of it had been reclaimed by Mountain Gravel as of 2004. However, whether the land could be reclaimed in 1995 is irrelevant and immaterial to the intent of the original contracting parties at the time of their 1950 and 1963 deeds. The Mined Land Reclamation Act, § 34–32–101, et seq., C.R.S.2005, was adopted in the 1970s. The Colorado Land Reclamation Act for the extraction of construction materials was adopted in the 1990s. Both acts were adopted long after the conveyances documented in the 1950 and 1963 deeds.

Second, we also reject Kinney's argument that the Keiths and Colberts failed to offer any evidence of intent regarding the Gawthrop deeds. Contrary to Kinney's argument, the record contains Gawthrop's written stipulation disclaiming that his mineral rights included the right to remove gravel. Nothing in the record contradicts Gawthrop's understanding.

Finally, Kinney argues that an affidavit he obtained from the Williamsons in 1994 raised a genuine issue of material fact as to whether the Wrights reserved gravel as part of the mineral estate in their 1963 deed to the Williamsons. The Williamson affidavit contained only one statement regarding the mineral reservation in the 1963 Wright deed: "[G]ravel was reserved and gravel was not intended to be conveyed as part of the land." The affidavit was not submitted in response to the Keiths' and Colberts' motion for summary judgment in 1995. Affidavits filed subsequent to the granting of a motion for summary judgment will not be reviewed. *See Cherry Creek Aviation, Inc. v. City of Steamboat Springs,* 958 P.2d 515 (Colo.App. 1998).

To the extent Kinney is arguing that the Williamson affidavit raised a factual issue sufficient to defeat summary judgment in 2004, we also disagree. The Williamson affidavit contained a single conclusory statement; it was not accompanied by any factual assertions. *See Brown v. Teitelbaum,* 830

P.2d 1081 (Colo.App.1991) (in response to a motion for summary judgment, an adverse party must by affidavit or otherwise set forth specific facts showing there is a genuine issue for trial). Mere allegations or conclusions are insufficient to create a factual issue. *Vail Nat'l Bank v. J. Wheeler Constr. Corp.*, 669 P.2d 1038 (Colo.App.1983).

For all these reasons, we conclude that the trial court did not err in summarily deciding, based on extrinsic evidence of the original contracting parties' intent, that gravel and sand are not minerals, but rather are part of the surface estate.

### D.

■ Kinney next contends that the Keiths and Colberts waived their interest in sand and other aggregate minerals. Specifically, Kinney argues that the Keiths and Colberts unequivocally elected to accept and limit themselves to the 1995 gravel judgment when, after the issuance of *Kinney I*, they filed a motion to dismiss stating that their claims had been resolved fully by the gravel judgment. Because Kinney failed to raise this argument in the trial court, we decline to address it here.

■ In *Kinney I*, a division of this court specifically directed the trial court to consider the rights of all parties with respect to sand and other minerals. On remand, Kinney never argued in the trial court that the Keiths and Colberts waived their interest to sand and other aggregate minerals, and therefore, in its 2004 final judgment, the trial court explicitly held that sand and "other aggregate minerals" were part of the surface estate. Arguments not presented to or ruled on by the trial court are deemed waived and cannot be raised for the first time on appeal. *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508 (Colo.1986). Accordingly, we will not consider the issue.

### E.

■ Kinney's contention that the trial court's judgment rendered the mineral estate a nullity is without merit. Kinney still retains the right to mine oil, gas, and "other minerals," such as gold. Therefore, the trial court's determination that sand and gravel were not reserved as part of the mineral estate does not nullify Kinney's mineral interests.

### F.

■ Kinney further contends that the trial court exceeded its authority under C.R.C.P. 60(a) when, on remand from this court for consideration of post-trial motions, it made more than clerical corrections to the December 2004 final judgment. Kinney also contends that the judgment was contrary to the parties' agreed facts. We disagree.

C.R.C.P. 60(a) gives district courts the power to correct "[c]lerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission ... at any time." The rule provides a means for the court to avoid enforcing an honestly mistaken judgment that is not in accord with the expectations and understanding of the court and the parties. *Reasoner v. Dist. Court*, 197 Colo. 516, 594 P.2d 1060 (1979) (court may correct such errors sua sponte).

Here, a division of this court remanded this case to the trial court for consideration of the Keiths' and Colberts' motion to amend, which was brought under C.R.C.P. 59(a) and 60(a). All the facts Kinney challenges in the December 2004 final judgment have been admitted by Kinney in earlier pleadings. Thus, we perceive no error in the facts as set forth in the December 2004 final judgment.

### G.

■ Finally, Kinney asserts that the trial judge erred in failing to recuse herself. We are not persuaded.

Kinney's argument for recusal was that the "case has taken way longer than it should have" and that the trial judge exceeded her authority in making more than clerical corrections to the December 2004 final judgment. Kinney urges that the "only way to have the remaining issues resolved quickly is to have [the trial judge] be recused, and have this Court interpret the deeds and 1976 quiet title action." However, no written motion for

recusal under C.R.C.P. 97 was filed by Kinney.

C.R.C.P. 97 expressly allows a judge to disqualify herself on the court's own motion "in an action in which [s]he is interested or prejudiced, or has been of counsel for any party, or is or has been a material witness, or is so related or connected with any party or his attorney as to render it improper for [her] to sit on the trial," and the Colorado Code of Judicial Conduct provides that a judge should disqualify herself under certain circumstances:

> A judge should disqualify . . . herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
> (a) A judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; [or]
> (b) a judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it . . . .

C.J.C. 3(C)(1); *see also Beckord v. Dist. Court,* 698 P.2d 1323 (Colo.1985).

Kinney has failed to offer any valid basis for recusal under either C.R.C.P. 97 or C.J.C. 3(C)(1). Moreover, Kinney's reliance on California Code of Civil Procedure § 170.6(2), which provides that an attorney can move to have a judge recused "following a reversal on appeal of a trial court's decision, or following reversal on appeal of a trial court's final judgment," is inapposite. California's Code of Civil Procedure is not relevant to our analysis of whether the trial judge should have recused herself under Colorado law. Under these circumstances, we conclude that the trial judge did not err in declining sua sponte to recuse herself.

## H.

In light of our holding that the trial court did not err in concluding that sand, gravel, and other aggregate minerals are part of the surface estate, we now address Kinney's ap-peal of the judgment entered against him on his waste and conversion claims.

## III. Waste and Conversion of Gold Action (04CA1406)

### A.

▇ Kinney contends that gold exists in the basal sand layer underlying the Keith Pit, one to four feet above the mancos shale layer, and that the surface owners either wasted the gold by pushing the basal sand layer into the wet mancos shale or converted the gold by stripping material down to the mancos shale, thereby removing the basal sand layer. Specifically, Kinney argues that the trial court abused its discretion in finding that (1) no commercial quantities of gold existed in the stratum above the mancos shale, and (2) even if they did exist, the area in question was not disturbed, and Kinney was free to mine it. We disagree.

Findings of fact are reviewed for clear error or abuse of discretion, whereas conclusions of law generally are reviewed de novo. *E–470 Pub. Highway Auth. v. 455 Co.,* 3 P.3d 18 (Colo.2000). We must accept the trial court's findings on review unless they are so clearly erroneous as not to find support in the record. *Bainbridge, Inc. v. Bd. of County Comm'rs,* 53 P.3d 646 (Colo.App.2001).

The trial court found that Kinney's claims for waste and conversion of gold failed based upon the preponderance of the evidence adduced at trial. First, the trial court found that there was no unreasonable conduct which resulted in physical damage to Kinney's mineral estate. Evidence showed that Mountain Gravel hired an expert initially to inspect the Keith Pit and samples then taken were negative for commercial quantities of gold. An independent firm also found no valuable minerals. A former employee testified that yearly inspections confirmed that no valuable minerals were being removed.

▇ Second, the trial court determined, based upon record evidence, that Mountain Gravel did not remove gravel all the way to the mancos shale, but left a sufficient layer of at least eighteen inches to support the operation of machinery. Although Kinney testified that the gravel had been removed all the

way to the mancos shale and then replaced with other gravel, the trial court found this testimony incredible in light of contrary testimony of several other witnesses.

Third, the trial court determined that there was no proof of gold in commercially retrievable quantities and that if such quantities of gold indeed exist in the stratum above the mancos shale, it had not been disturbed and was still available for Kinney's use.

Kinney disputes each of these findings and the sufficiency of evidence upon which they are based.

Kinney first contends that a layer of sand existed which was at least one foot in depth and that it had been either removed altogether or driven into cracks in the mancos shale and therefore lost. We find no record support for Kinney's statements that the surface owners admitted that at least twelve inches of basal sand once existed on top of the mancos shale in the Keith Pit and that this stratum was disturbed by the gravel operator running heavy machinery in the bed of the pit and destroying the gold by driving it into the mancos shale layer where it could not be mined. Michael Matheson, the surface owners' expert geologist, testified as to the thickness or depth of the "sandy gravel layer":

It varied, you know, from seemingly not present or indistinguishable from the gravel above, to several inches or perhaps a foot, you know, in thickness. And it's not really a sand layer, per se. It's just a layer that's somewhat sandier than the gravel above. It does contain gravel. And, in some cases, I recall it had more of a[n] orangish or rusty color.

This testimony was corroborated by David Hyndman, Kinney's expert geophysicist, who conducted a geophysical investigation of the Keith Pit in July 2000. He described the strata profile of the Keith Pit as follows: "Surface soil materials, gravel and a layer at the bottom, on the order of a foot thick, of sand, with some gravel in the sand. The sand had a gradation in it, gradation both in color and particle size." Based upon this testimony, we conclude that there is no record evidence of a uniform depth of the basal sand layer and no record evidence that the layer of sand was merely sand, as opposed to

sandy gravel. Indeed, the basal sand layer appears to be a gravel and sand mixture located above the mancos shale, varying from a few inches, if that, up to a foot. Similarly, there is nothing in the record to suggest that the basal sand layer, where present, was removed.

Furthermore, some evidence in the record tends to show that the layer of gravel and sand above the mancos shale was not disturbed. Specifically, the pit was operated to assure a stable floor for vehicles, which is an indication that the basal gravel and sand layer was not disturbed and removed. Witness Siegmund explained that it is "fairly wet right at about the two foot level, so we leave a couple feet on top [of the mancos shale] so that we can operate on a stable surface." Keith testified that Mountain Gravel always left at least two feet of gravel above the mancos shale and that when an operator got too close to the mancos shale, the heavy equipment would begin to sink into the material and the operator would have to retreat and leave more native material to ensure a solid operating base. Kinney admitted that water runs on the top of the mancos shale, and the record shows that a drainage method was employed to remove the water and keep the operating base as dry as possible.

David King, a former employee of Mountain Gravel who handled the permitting work for the Keith Pit, testified that part of the reclamation plan for the Keith Pit was to leave at least eighteen inches of native material above the mancos shale so that the property could support an irrigated hayfield. He testified that Mountain Gravel never changed its plan to stay well above the mancos shale. Matheson, along with Seigman, explained how important it was that no amount of mancos shale be incorporated into the gravel products, because in such case, the entire product could be rejected for not meeting the specifications of the Colorado Department of Transportation.

Kinney's own method of sampling lends support to the trial court's finding that material was not removed all the way to the mancos shale. Kinney took samples from the Keith Pit and labeled each hole with an

S, M, or D to indicate the depth of the material above the mancos shale. The S meant there were about two feet of material above the mancos shale, the M indicated another foot, and the D signified even more material. For each sample he took, Kinney dug at least a couple feet in each hole to get down to the top of the mancos shale. Hyndman's graphic representations showed him standing on material above the mancos shale, not on the mancos shale itself. Kinney's son confirmed that in some places the gravel was so thick that they were unable to reach the top of the mancos shale when they tried to get a sample. Matheson also testified that when he went to the site during the time Kinney was performing his sampling, the entire pit was covered by one to eleven feet of native gravel material above the mancos shale. No evidence demonstrated exposed mancos shale on the surface; instead, the record shows that Kinney had to dig holes to reach the mancos shale to conduct his tests.

Finally, there is testimony that there were no commercial concentrations of gold in the Keith Pit. Kinney argues that there were 9.4 parts per million of gold ore in the twelve inches above the mancos shale. However, the trial court determined, with record support, that this contention was based upon speculation and unreliable calculation.

Kinney's evidence of commercial concentrations of gold in the Keith Pit was based upon samplings, which he conducted. After Kinney collected the samples, he gave duplicates to Mountain Gravel and then asked his son, who was the sole officer of Rocky Mountain Bluebird Ranch, to transport his samples to a laboratory out of state for analysis. Kinney provided no chain of custody for the samples or scientific control.

Based upon extrapolating the results from Kinney's laboratory, assuming various layers of basal sand from one to four feet, Kinney argues that he proved commercial quantities of gold were present in the amounts of five to ten million dollars. Samples tested by Mountain Gravel showed no commercial quantities; however, Mountain Gravel did not test the duplicate samples provided by Kinney.

Matheson discredited Kinney's method of sampling. He testified that it was contrary to standard protocol to allow a client to possess the sample because the sample could be spiked or modified. He explained that Kinney's tests indicating the presence of elemental gold did not undergo a critical step in that extrapolation process—weighing the samples. He therefore concluded that, because of the error in calculation, even if Kinney's lab tests were found to be credible, his extrapolation calculations of the parts per million of gold in the Keith Pit were off by "several orders of magnitude."

The lab analysis performed for Matheson showed no commercial quantities of gold or other minerals in the gravel to be removed by Mountain Gravel. These results were consistent with Mountain Gravel's spot testing, which consistently revealed no valuable minerals in the gravel. Mountain Gravel tested from the depths where gravel was removed; it did not test to the top of the mancos shale. Before any excavation of gravel from the Keith Pit, Mountain Gravel had the pit inspected, and no profitable quantities of gold were found. Similarly, additional evaluations submitted to the Mined Land Reclamation Board found no gold, silver, or gemstones in the Keith Pit.

The trial court further discounted Kinney's damage calculations because he did not factor in the cost of removing and replacing upper strata to access the gold he claimed to be present in the basal sand layer.

Kinney's claim that even the surface owners admitted they saw gold in the basal sand layer is refuted by the testimony of King. King testified that a 1949 report indicated "a widespread dissemination of minute amounts of what we call flour gold from the La Platas, down to, approximately, the New Mexico state line. But, you know, it's described as scattered and insignificant." He explained that "flour gold" is "very, very, very, very tiny flakes of gold" that "may not even be visible to the eye" and "[j]ust kind of a sheen that you might see in the heavy sand concentrate, and that would be expected." He testified that Mountain Gravel performed a preliminary evaluation "of the economic significance of minerals in the gravel ob-

served on the Keith Pit" and detected no gold. However, he noted that, in visual observations of the sand fraction that had been collected, they saw "a gold, shiny-like little thing" through their ten-power hand lens in a couple of samples that "could have been muscovite, it could have been gold," but they could not really determine for sure. They sent one of those samples to the laboratory for analysis, and gold was not detected. After the analysis was completed, King opined that there were no commercially viable resources in the Keith Pit, other than the gravel itself.

Kinney testified that with new processing technology, which had been reported in a magazine, 9.4 parts per million of gold in the basal sand layer was a commercially feasible amount. However, no evidence was presented by anyone who had worked with this new technology to demonstrate that it was appropriate to use in an environment like the Keith Pit. *See People v. Shreck*, 22 P.3d 68 (Colo.2001) (when deciding the admissibility of expert testimony, a court must make findings on the record that the testimony is (1) reasonably reliable; (2) helpful to the jury; (3) probative under CRE 403; and (4) given by a qualified expert). Although Kinney was endorsed as an expert, there is no foundation in the record to show reliability for the methods he described, and the record does not indicate that the trial court found that the methods were reasonably reliable.

Thus, there was no reliable testimony to support the existence of either a placer, lode, or vein of gold in commercial quantities; nor was there any reasonably reliable scientific proof that there were sufficient commercial quantities of gold present to warrant mining, let alone that there may have been sufficient commercial quantities of gold present above the surface of the mancos shale. It was within the trial court's discretion to weigh the evidence, along with the expert testimony, and determine that, based upon conflicting evidence, there was no proof that commercial quantities of gold existed in the area above the mancos shale, and even if such quantities existed, that the area in question was not disturbed. Indeed, the evidence demonstrates that there were approximately eighteen inches of gravel above the mancos shale at all times. Kinney's claim that the gravel was removed and replaced with "junk gravel" is based upon his uncorroborated testimony and speculation.

Because ample evidence exists in the record to support the trial court's findings, we will not disturb them on review. In particular, the trial court's inherent determination that the surface owners and their witnesses were more credible than Kinney and his witnesses is within the court's sole discretion, and we will not second-guess it. *See Bainbridge, Inc. v. Bd. of County Comm'rs, supra.*

### B.

Kinney contends that the trial court ignored the law of the case as set forth by a division of this court in *Kinney II.* We are not persuaded.

### 1.

Kinney asserts that the trial court ignored the *Kinney II* division's citation to *Gilpin Investment Co. v. Perigo Mines Co., supra,* for the proposition that "[e]ven small amounts of minerals found on the surface have been recognized as part of the mineral estate." We disagree.

In *Gilpin,* rains and surface water washed gravel down the slopes of the property, leaving on the surface of the claim a light deposit containing flecks of gold and other valuable minerals. The plaintiff asked for a decree adjudging it to be the owner of all loose minerals on the tract claimed. The court reviewed the various deeds in the chains of title and held that the term "mineral rights," as used in those deeds, included, but was not limited to, "loose materials on the surface of the land in controversy." *Gilpin Inv. Co. v. Perigo Mines Co., supra,* 161 Colo. at 258, 421 P.2d at 480. The court did not define "loose surface materials."

In this appeal, however, we have concluded that the gravel and the sand belong to the surface owners. *Gilpin* does not support Kinney's contention that trace amounts of gold found within those loose surface materials belong to the mineral estate to the exclu-

sion of the surface estate. Thus, the trial court did not err in failing to rely on *Gilpin* for its conversion analysis.

### 2.

Kinney asserts that the trial court improperly relied upon *Coon v. Placid Oil Co.*, 493 So.2d 1236 (La.Ct.App.1986), to determine whether he established a claim for conversion, rather than *Omaha & Grant Smelting & Refining Co. v. Tabor*, 13 Colo. 41, 21 P. 925 (1889), which was specifically cited in *Kinney II*. Again, we disagree.

■ "A 'conversion' is defined to be any act of the defendant inconsistent with the plaintiff's right of possession, or subversive of his right of property." *Omaha & Grant Smelting & Refining Co. v. Tabor, supra,* 13 Colo. at 54–55, 21 P. at 930. Kinney thus argues that, to establish conversion under *Omaha & Grant,* he need only prove that the twelve-inch layer above the mancos shale was destroyed. Because there is sufficient evidence to support the trial court's findings that there was no destruction of the layer above the mancos shale and that there were no commercial quantities of gold in the Keith Pit, Kinney's conversion claim necessarily fails.

Accordingly, we affirm the determination that Kinney failed to establish a conversion claim, but on grounds different from those relied on by the trial court. *See W. Colo. Cong. v. Umetco Minerals Corp.*, 919 P.2d 887 (Colo.App.1996) (appellate court may affirm on grounds different from those of the trial court).

In light of our holding, we need not address Kinney's challenge to the trial court's finding of waiver and estoppel.

### 3.

Kinney also argues that the trial court ignored the holding in *Federal Deposit Insurance Corp. v. Mars,* 821 P.2d 826 (Colo. App.1991), when it determined that Kinney failed to establish the elements of waste. We disagree.

*Mars* holds that to bring a claim for waste, the claimant must have a concurrent nonpossessory vested interest in the property. Here, the trial court allowed Kinney's waste claim to proceed, thereby accepting that Kinney had a vested concurrent nonpossessory interest in the mineral rights located in the Keith Pit. Accordingly, we reject Kinney's allegation that the trial court ignored the law of *Mars.*

### C.

■ We also reject Kinney's contention that the trial court ignored the mining laws.

Although Kinney cites to § 34–44–105, C.R.S.2005, for the proposition that he would be entitled to nominal damages for the removal of gold and, once he was able to mine, he could prove up his damages, he ignores the remaining Colorado mining statutes that require, as a prerequisite, the location of a mineral deposit. As we already discussed, Kinney never located a mineral deposit. Instead, he relies upon the purported proof that the testing of his own samples show that there is gold somewhere in the Keith Pit. Of course, Kinney is free to explore the area above the mancos shale and thereby locate a mineral deposit.

### D.

■ Kinney argues that he is entitled to a statutory accounting, and therefore, the trial court abused its discretion by not allowing him to amend his claims to add a statutory accounting claim pursuant to § 34–44–104, C.R.S.2005. We are not persuaded.

On the first day of trial, Kinney sought to amend the complaint to add a statutory accounting claim under § 34–44–101, et seq., C.R.S.2005. The trial court refused to allow the amendment:

[W]hen we had the trial management conference, it appeared to the Court, apparently appeared to [defendants' attorney], that the issues that were involved were waste and conversion, that the accounting was no longer going to be an issue. I'm also concerned because of ... what appears to be a shift at this late date to switch it to a statutory accounting under what you cited in your earlier argument .... I'm not going to let you amend at this

point to pursue a claim under 34–44–101. That should have been done long ago.

C.R.C.P. 15(a) provides in part:

A party may amend his pleading once as a matter of course at any time before a responsive pleading is filed or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it any time within twenty days after it is filed. Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires....

 The part of the rule permitting amendment by leave of court is applicable in this situation. Under well-established law, leave to amend is a discretionary matter which is left to the trial court to determine. *Polk v. Denver Dist. Court,* 849 P.2d 23 (Colo.1993). Thus, absent an abuse of discretion, we will not interfere with the trial court's ruling. Because the proposed amendment was not requested until the first day of trial, we conclude that the trial court's denial of leave to amend was within its discretion.

### E.

Kinney urges us to direct the trial court to deny the surface owners' motion for attorney fees that is currently pending in the trial court in the case in 04CA1406. Because the trial court has not yet ruled on the motion, we remand to the trial court for consideration of the surface owners' request for attorney fees. *See Ski Time Square Condo. Ass'n v. Ski Time Square Enters.,* 119 P.3d 588 (Colo.App.2005).

### F.

The surface owners also request attorneys fees on appeal in 04CA1406. We conclude that the appeal in that case was wholly frivolous and groundless because in the trial court Kinney was unable to establish any element of any claim and yet he chose to appeal findings of the trial court that had ample factual support in the record. Therefore, we remand under C.A.R. 39.5 for the trial court to determine the reasonable amount of attorney fees and costs incurred during the appeal in 04CA1406.

That portion of the appeal in 04CA1406 regarding attorney fees is dismissed; the judgments are affirmed; and the case in 04CA1406 is remanded to the trial court for further proceedings consistent with this opinion.

VOGT and ROMÁN, JJ., concur.